48 A.3d 1164

IN RE CONTEST OF NOVEMBER 8, 2011 GENERAL ELECTION OF OFFICE OF NEW JERSEY GENERAL ASSEMBLY, FOURTH LEGISLATIVE DISTRICT.

Superior Court of New Jersey
Law Division, Civil Part, Camden County

Decided January 5, 2012.

*Matthew S. Wolf,* for petitioner Shelley Lovett (*Pappas & Wolf, LLC,* attorneys).

*William M. Tambussi,* for respondent Gabriela Mosquera (*Brown & Connery, LLP,* attorneys).

*George N. Cohen,* Deputy Attorney General, for respondents (Attorney General of New Jersey and the Secretary of State, *Paula T. Dow,* Attorney General, attorney).

LEONE, J.S.C.

The New Jersey Constitution provides that "[n]o person shall be a member of the General Assembly who shall not . . . have been a citizen and resident . . . of the district for which he shall be elected [for] one year, next before his election." *N.J. Const.* art. IV, § 1, ¶ 2. Respondent, Gabriela Mosquera, recently elected to the General Assembly from the Fourth Legislative District, admits that she was not a resident of the district for a full year before her election. Respondent argues, however, that this provision of the New Jersey Constitution violates the Equal Protection Clause in the Fourteenth Amendment of the United States Constitution. Respondent emphasizes that the United States District Court for the District of New Jersey so found in *Robertson v. Bartels,* 150 *F.Supp.*2d 691 (D.N.J.2001). Respondent also argues

that petitioner Shelley Lovett's post-election challenge comes too late and seeks the wrong remedy.

The parties agree that *Robertson* is not binding on this court, and that this court must itself decide whether the one-year district residency requirement of the New Jersey Constitution violates the federal Equal Protection Clause. With all due respect to *Robertson*, this court finds that the residency requirement is constitutional. Because respondent did not comply with that requirement, she was ineligible for the General Assembly at the time of the election. Under New Jersey election laws, her certificate of election is annulled, and her election is set aside. Although petitioner's challenge did not come too late, she does request the wrong remedy. Under New Jersey's election laws, a new election for General Assembly must be held in the Fourth Legislative District at the time of the general election on November 6, 2012. Moreover, the appropriate members of the Democratic county committees must select an interim successor to fill the vacant seat by February 14, 2012.

## I. PROCEDURAL HISTORY

This challenge concerns the November 8, 2011, election for General Assembly in the Fourth Legislative District, which covers portions of Camden and Gloucester Counties. In that election, Paul D. Moriarty and respondent, both Democrats, received the first and second largest vote totals respectively, and both received certificates of election to the General Assembly. Petitioner and Patricia Fratticcioli, both Republicans, received the third and fourth largest vote totals, respectively.[1]

---

[1]

| Candidate | Vote Tally |
|-----------|-----------|
| Paul D. Moriarty | 21,086 |
| Gabriela Mosquera | 19,907 |

On December 1, 2011, petitioner filed a petition pursuant to *N.J.S.A.* 19:29–1. Petitioner alleged that respondent had not resided in the Fourth Legislative District for a year preceding the election, in violation of *N.J. Const.* art. IV, § 1, ¶ 2. She also filed an order to show cause asking for emergency relief, which this court denied without prejudice.

Respondent filed a motion to dismiss the petition. She alleged that the New Jersey Constitution's one-year district residency requirement no longer existed because it had been declared unconstitutional by the United States District Court in *Robertson*. Respondent and the Attorney General filed a brief in support of the motion to dismiss and petitioner filed a brief in opposition. Respondent then filed a reply brief, in which he claimed for the first time that petitioner waited too long to file her petition and requested the wrong relief.

Pursuant to *N.J.S.A.* 19:29–4, a hearing on the motion to dismiss was held on December 19, 2011. At the hearing, the parties agreed that *Robertson* was not binding on this court, but debated its persuasiveness. This court denied the motion to dismiss, respondent filed her answer to the petition, and this court proceeded to hold a plenary hearing at which both petitioner and respondent testified.

At the conclusion of the hearing, this court ordered further briefing, including on the timeliness of the petition and the appropriate remedy, which petitioner and the Attorney General had not had the opportunity to address. Petitioner, respondent, and the Attorney General all filed briefs on December 30, 2011. The Attorney General, on further consideration, took the position that *Robertson* had applied an incorrect standard of scrutiny, and that

| | |
|---|---|
| Shelley Lovett | 14,351 |
| Patricia Fratticcioli | 14,000 |
| Tony Celeste | 1767 |

the one-year district residency requirement did not violate the United States Constitution if a lesser level of scrutiny were applied. The Attorney General agreed that the petition was timely, but stated that both parties had selected an incorrect remedy.

This court heard further argument on January 5, 2012. This court now rules on the petition.

## II. FACTS

Respondent now lives in Blackwood, a town in Gloucester Township, Camden County, New Jersey, which is within the Fourth Legislative District. It is conceded that respondent has only resided there since December 27, 2010, at the earliest, which is the date she filed a deed to that property. It is stipulated that respondent has not lived within the Fourth Legislative District for "one year, next before her election," which would have required her to live in the District since November 8, 2010, and that she therefore did not comply with the one-year district residency requirement in *N.J. Const.* art. IV, § 1, ¶ 2.

Respondent has lived in New Jersey since she was three or four years old. She grew up in Union City, until she went to college at Seton Hall University and The College of New Jersey. After college, she worked in Trenton and lived in Hamilton. She then moved home to North Bergen for a period of time, and then moved to Deptford in Gloucester County, and then to Maple Shade in Burlington County in January 2010. All of those locations are in New Jersey, but none are within the Fourth Legislative District. Respondent continued to live in Maple Shade until she moved into the Fourth Legislative District between December 29 and December 31, 2010, upon the expiration of her lease on her Maple Shade apartment. She also voted in Maple Shade on November 2, 2010.

Respondent's relocation of her residence into the Fourth District Legislative District occurred several months after she began to work for the Mayor of Gloucester Township. Respondent, then

living in Maple Shade, wanted a residence closer to work and in a great community. She got pre-mortgage qualification in October, and began looking for properties. On November 13, 2010, she entered into a contract to purchase a home in Blackwood. She closed on the property on December 29, 2010, and moved into her new home between December 29 and December 31, 2010.

Respondent intends to make Gloucester Township her permanent residence. She obtained a driver's license with her Blackwood address in February 2011. She registered to vote in the Fourth District on February 24, 2011, and has voted in all four elections held in Gloucester Township since that time.

Respondent had worked for five years as a staff member in the Assembly Democratic Office in Trenton. She then worked for two years in the Camden office of a member of the General Assembly in the Fifth Legislative District.

Since January 4, 2010, respondent has been working in the Fourth District as confidential aide to the Mayor of Gloucester Township. Her duties include keeping the mayor's schedule and running the office. Through the course of her employment, she comes in contact with the residents of Gloucester Township on a daily basis, and thus is familiar with the people and issues in the Township.

When respondent moved to Blackwood in late December 2010, she was not doing so with the intent to run for office. An opportunity to run for the General Assembly for the Fourth Legislative District was presented to her in 2011. An incumbent member of the General Assembly from the Fourth District decided not to run for re-election.

When respondent began campaigning for the General Assembly, she had a variety of interactions with thousands of the approximately 220,000 residents of the Fourth Legislative District. She knocked on doors, gave out literature personally, visited towns, met voters, went to community events, and held two fundraising events, among other activities. She also did mailings and pur-

chased television ads on major networks. Although she did not campaign while she was working at her full-time job, she spent almost every weekday evening and weekend campaigning.

Petitioner also lives in Gloucester Township. She has lived within the Fourth Legislative District for thirty-two years. She too ran for the General Assembly from the Fourth Legislative District. In June 2011, after the primary, she heard a rumor that respondent had not lived in the Fourth Legislative District long enough that she would have lived there for a full year before the November 8, 2011, election. Petitioner since indicated to a reporter that she decided not to litigate the matter because she did not have the money or the resources to do so. Petitioner is now represented by *pro bono* counsel.

### III. ANALYSIS

A. *The One–Year District Residency Requirement Is Constitutional.*

The principal issue before this court is whether the one-year district residency requirement of Paragraph 2 of Section 1 of Article IV of the New Jersey Constitution (hereinafter "Paragraph 2") violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (hereinafter the "federal Equal Protection Clause"). The federal Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const.* amend. XIV, § 1.

1. The New Jersey Constitution Requires Candidates For
The General Assembly To Live For One Year In The
District They Seek To Represent.

The New Jersey Constitution vests the legislative power in the New Jersey Senate and General Assembly. *N.J. Const.* art. IV, § 1, ¶ 1. Paragraph 2 then provides:

No person shall be a member of the Senate who shall not have attained the age of thirty years, and have been a citizen and resident of the State for four years, and of

the district for which he shall be elected one year, next before his election. No person shall be a member of the General Assembly who shall not have attained the age of twenty-one years and have been a citizen and resident of the State for two years, and of the district for which he shall be elected one year, next before his election. No person shall be eligible for membership in the Legislature unless he be entitled to the right of suffrage.

[*N.J. Const.* art. IV, § 1, ¶ 2.]

■ Under Paragraph 2, "by the date of the general election, a candidate for the General Assembly must have been a resident of the district he or she seeks to represent for one year." *Motley v. Cohen,* 267 *N.J.Super.* 325, 328, 631 *A.*2d 576 (Law Div.1993); *see also OAG Formal Opinion No. 5–1980,* 1980 *N.J. AG LEXIS* 22 (Feb. 26, 1980).

In 1977, the Appellate Division upheld the constitutionality of the durational residency requirement of Paragraph 2. *Ammond v. Keating,* 150 *N.J.Super.* 5, 374 *A.*2d 498 (App.Div.), *certif. denied,* 74 *N.J.* 285, 377 *A.*2d 689 (1977). A trial judge had ruled that, by requiring that a Senate candidate be a resident in the district for one year before his election, Paragraph 2 violated the Fourteenth Amendment. *Id.* at 6–7, 374 *A.*2d 498. The Appellate Division reversed, holding that "the constitutional and statutory residency requirement for the office of State Senator fills a compelling state need and is rationally related to legitimate state objectives." *Id.* at 9, 374 *A.*2d 498.

2. The District Court In *Robertson* Declared Unconstitutional The One–Year Residency Requirement.

In 2001, however, a federal judge held that Paragraph 2's durational residency requirement was unconstitutional. *Robertson, supra,* 150 *F.Supp.*2d 691. The challenge was brought by two candidates for the General Assembly. *Id.* at 693. The defendants, the Secretary of State and Attorney General for New Jersey, moved for summary judgment. *Ibid.* On July 19, 2001, the United States District Court concluded:

New Jersey's one-year residency requirement for candidates for the Senate and General Assembly does not survive a strict scrutiny inquiry and is, therefore, violative of the Constitution's Equal Protection Clause. Consequently the defendants' motion for summary judgment ... will be denied. Plaintiffs have not cross-

moved for summary judgment, but if such motion were filed it would most likely be granted.

[*Id.* at 699.]

A notice of appeal was filed on July 26, 2001. On February 28, 2002, the United States Court of Appeals for the Third Circuit summarily affirmed the denial of the defendants' motion for summary judgment.[2] On September 27, 2002, the plaintiffs filed a motion for summary judgment, which was granted by the District Court on November 13, 2002. The District Court's order provided that Paragraph 2's one-year residency requirement is violative of the Fourteenth Amendment, and that the Secretary of State and the Attorney General and their agents and employees are restrained and enjoined from enforcing that requirement.[3] The Secretary of State and the Attorney General did not appeal.[4]

3. All Agree That *Robertson* Is Not Binding On This Court.

▮▮▮▮ Both parties and the Attorney General agree that the District Judge's opinion in *Robertson* is not binding on this court,

[2] The parties have been unable to obtain the ruling of the Third Circuit.

[3] The parties dispute whether *Robertson* found that Paragraph 2 was facially violative of the federal Equal Protection Clause, or only as applied. Based on *Robertson* 's broad language and its equally broad order, this court believes that *Robertson* is a facial ruling.

[4] Originally, the challenge to the one-year residency requirement in Paragraph 2 was combined with a challenge to the 2001 redistricting of the Senate and General Assembly, and thus was assigned to a three-judge court. *Robertson, supra,* 150 *F.Supp.*2d at 692–93. The three-judge court denied the redistricting challenge, but it found the residency issue "so distinct" that on June 18, 2001, it referred that issue to the single judge for disposition. *Robertson v. Bartels,* 148 *F.Supp.*2d 443, 459–62 (D.N.J.2001). The three-judge court's ruling on redistricting was summarily affirmed by the United States Supreme Court on January 22, 2002. *Id.* at 445, *aff'd,* 534 *U.S.* 1110, 122 *S.Ct.* 914, 151 *L.Ed.*2d 881 (2002); *see also McNeil v. Legislative Apportionment Comm'n,* 177 *N.J.* 364, 372–73, 828 *A.*2d 840 (2003). Thus, the challenge to Paragraph 2 was not before the United States Supreme Court, whose order came after that issue was referred to the single judge, while the single judge's denial of the defendants' summary judgment motion was pending before the Third Circuit, and before the plaintiffs ever moved for summary judgment.

despite the deservedly high reputation of that Judge and of the District Court for the District of New Jersey. First, " '[a] decision of a federal District Court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.' " *Camreta v. Greene*, —— U.S. ——, —— n. 7, 131 *S.Ct.* 2020, 2033 n. 7, 179 *L.Ed.*2d 1118 (2011) (citation omitted).[5]

Second, the New Jersey Supreme Court has made clear that, while "the United States Supreme Court is the final arbiter on all questions of federal constitutional law," the lower federal courts do not bind state courts on federal constitutional questions. *State v. Coleman*, 46 *N.J.* 16, 34–36, 214 *A.*2d 393 (1965) (declining to follow a Third Circuit opinion). "In passing on federal constitutional questions, the state courts and the lower federal courts have the same responsibility and occupy the same position; there is parallelism but not paramountcy for both sets of courts are governed by the same reviewing authority of the Supreme Court." *Id.* at 36–37, 214 *A.*2d 393 (citations omitted); *accord Dewey v. R.J. Reynolds Tobacco Co.*, 121 *N.J.* 69, 79–80, 577 *A.*2d 1239 (1990); *State v. Witczak*, 421 *N.J.Super.* 180, 194–95, 23 *A.*3d 416 (App.Div.2011). Thus, a ruling by a lower federal court that a state statute is unconstitutional is not binding on the state courts. *See State v. Norflett*, 67 *N.J.* 268, 286–87 & nn. 15–16, 337 *A.*2d 609 (1975) (enforcing a state statute found unconstitutional by a three-judge court); *Assocs. Commercial Corp. v. Wallia*, 211 *N.J.Super.* 231, 237–39, 511 *A.*2d 709 (App.Div.1986).

"Of course, elementary considerations of judicial comity require us to give due respect to the decisions of the lower federal courts, particularly on questions involving the federal constitution," *Norflett, supra,* 67 *N.J.* at 286, 337 *A.*2d 609, and "particularly where they are in agreement." *Dewey, supra,* 121 *N.J.* at 80, 577 *A.*2d 1239. *See also Coleman, supra,* 46 *N.J.* at 32, 214

---

[5] Similarly, a non-precedential ruling of the Third Circuit is not binding.3d Cir. I.O.P. 9.1, *available at* http://www.ca3.uscourts.gov/Rules/IOP_2010_final2.pdf.

A.2d 393. This court must give the District Court's opinion due respect in an attempt "to ensure uniformity" and to "discourage[ ] forum shopping." *Dewey, supra,* 121 *N.J.* at 80, 577 *A.*2d 1239; *see also Witczak, supra,* 421 *N.J.Super.* at 194, 23 *A.*3d 416.

### 4. This Court Must Follow Binding Precedent Of The United States Supreme Court And The New Jersey Supreme Court.

Of course, this court is not entirely "free to determine whether [*Robertson*'s] declaration of the reach of the federal constitution should apply here." *Witczak, supra,* 421 *N.J.Super.* at 195, 23 *A.*3d 416. This court is bound by the Supreme Court of the United States and the New Jersey Supreme Court to the extent their opinions are relevant to this issue. *Id.* at 196, 23 *A.*3d 416.

The United States Supreme Court has not issued a precedential opinion on the constitutionality of durational residency requirements for candidates. However, the Court has ruled on that issue by summarily affirming decisions upholding such requirements. In *Hadnott v. Amos,* 401 *U.S.* 968, 91 *S.Ct.* 1189, 28 *L.Ed.*2d 318 (1971), the Court affirmed, without opinion, a decision upholding, against a federal Equal Protection challenge, a provision of the Alabama Constitution requiring that a state circuit judge reside "for one year next preceding his election" in "the circuit for which he is elected." *Hadnott v. Amos,* 320 *F.Supp.* 107, 119–20 (M.D.Ala.1970) (quoting *Ala. Const.* art. VI, § 142), *aff'd,* 401 *U.S.* 968, 91 *S.Ct.* 1189, 28 *L.Ed.*2d 318 (1971); *see id.* at 130 (Johnson, J., dissenting).[6]

In *Chimento v. Stark,* 414 *U.S.* 802, 94 *S.Ct.* 125, 38 *L.Ed.*2d 39 (1973), the Court affirmed without opinion the judgment of a three-judge court that the federal Equal Protection Clause was

---

[6] Because the candidate challenging this provision had "at no time become a resident of the judicial circuit," the Alabama District Court did not "decide whether one year was too long." *Hadnott, supra,* 320 *F.Supp.* at 119. However, the court ruled that the state had "a compelling interest in imposing a substantial pre-election residence requirement." *Id.* at 124.

not violated by a provision in the New Hampshire Constitution providing that no person was eligible to be governor unless he had been an inhabitant of the state for seven years before his election. *Chimento v. Stark*, 353 *F.Supp.* 1211, 1212, 1217–18 (D.N.H.), *aff'd*, 414 *U.S.* 802, 94 *S.Ct.* 125, 38 *L.Ed.*2d 39 (1973). Similarly, the Court affirmed without opinion an unpublished ruling by the District Court of South Carolina upholding a five-year durational residency requirement for governor. *Kanapaux v. Ellisor*, 419 *U.S.* 891, 95 *S.Ct.* 169, 42 *L.Ed.*2d 136 (1974); *see, e.g., Rivera v. Hamilton*, 393 *F.Supp.* 120, 125 n. 13 (D.Del.1975).

Finally, in *Sununu v. Stark*, 420 *U.S.* 958, 95 *S.Ct.* 1346, 43 *L.Ed.*2d 435 (1975), the Court affirmed without opinion the judgment of a three-judge court that the federal Equal Protection Clause was not violated by another provision of the New Hampshire Constitution providing that no person could be elected as a state senator unless he had been an inhabitant of the state for seven years before his election. *Sununu v. Stark*, 383 *F.Supp.* 1287, 1289–92 (D.N.H.1974), *aff'd*, 420 *U.S.* 958, 95 *S.Ct.* 1346, 43 *L.Ed.*2d 435 (1975).

■ The United States Supreme Court has made clear that a summary affirmance of a district court's judgment is "a controlling precedent," but is not " 'of the same precedential value as would be an opinion of this Court treating the question on the merits.' " *Tully v. Griffin, Inc.*, 429 *U.S.* 68, 74, 97 *S.Ct.* 219, 223, 50 *L.Ed.*2d 227, 233 (1976) (citations omitted). A summary affirmance "indicates only our agreement with the result reached by the District Court," *Sporhase v. Nebraska*, 458 *U.S.* 941, 949, 102 *S.Ct.* 3456, 3460, 73 *L.Ed.*2d 1254, 1261 (1982), and "is not to be read as an adoption of the reasoning supporting the judgment under review," *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 *U.S.* 190, 212 n. 24, 103 *S.Ct.* 1713, 1726 n. 24, 75 *L.Ed.*2d 752, 770 n. 24 (1983).

Thus, in *Hadnott, Chimento, Kanapaux,* and *Sununu,* the United States Supreme Court has agreed that the federal Equal Protection Clause is not violated by seven-year state residency

requirements for governor and state senator, a five-year state residency requirement for governor, and a requirement that a candidate for state trial judge have resided for a substantial period in his circuit. *See Clements v. Fashing*, 457 *U.S.* 957, 967–68, 102 *S.Ct.* 2836, 2845–46, 73 *L.Ed.*2d 508, 518–19 (1982) (plurality opinion) ("[W]e upheld a 7–year durational residency requirement for candidacy in *Chimento*"). Under these binding holdings, "there can be no doubt that these recent cases hold that some durational residency requirements are constitutionally permissible." *Beil v. Akron*, 660 *F.*2d 166, 168–69 (6th Cir.1981); *Woodward v. Deerfield Beach*, 538 *F.*2d 1081, 1084 (5th Cir.1976); *see also Billington v. Hayduk*, 565 *F.*2d 824, 826 (2d Cir.1977). Indeed, in upholding Paragraph 2, the Appellate Division relied on *Chimento* and *Sununu* as "authoritative decisions from the court of last resort." *Ammond, supra*, 150 *N.J.Super.* at 8–9, 374 *A.*2d 498.

While the New Jersey Supreme Court has not directly ruled on the constitutionality of Paragraph 2's durational residency requirements, it has addressed them in passing. In rejecting a claim that Paragraph 2's minimum age requirements violated the federal Equal Protection Clause, the New Jersey Supreme Court generally stated that state requirements "affecting the selection and qualification of candidates must exist to ensure fair and honest elections and keep order in the democratic process." *Wurtzel v. Falcey*, 69 *N.J.* 401, 403, 354 *A.*2d 617 (1976). The Court added that "classifications based on residence, age, and citizenship are expressive of the state's legitimate interest in the integrity of the ballot, and if these classifications are reasonable, they are constitutionally inoffensive." *Ibid.* (citing *Gangemi v. Rosengard*, 44 *N.J.* 166, 173–74, 207 *A.*2d 665 (1965)).[7]

---

[7] Respondent asserts that *Gangemi* struck down a state residency requirement. In fact, "[t]he legality of the [two-year] residence requirement was not at issue in *Gangemi*." *Hardy v. Ruhnke*, 47 *N.J.* 10, 24, 218 *A.*2d 861 (1966). Rather, the issue was a separate requirement that the candidate be a registered voter. Indeed, the Supreme Court in *Gangemi* specifically noted that *Stothers v.*

In two other cases, the New Jersey Supreme Court addressed a statutory durational residence requirement. First, in *Stothers v. Martini*, 6 *N.J.* 560, 567, 79 *A.*2d 857 (1951), the New Jersey Supreme Court upheld *N.J.S.A.* 40:72–1, which required a municipal commissioner to have been a citizen and resident of the municipality for at least two years. The Court specifically analogized to Paragraph 2's requirements for members of the General Assembly and Senate, noting that:

> the Constitution itself by providing residency requirements for key officers in the State Government has enunciated the principle that the persons who are to make and execute the laws of the State should have a substantial period of residence in this State in order to familiarize themselves with its conditions and needs. [*Ibid.*]

The Court found the statute not to be "arbitrary, capricious, or unreasonable." *Id.* at 171–72, 79 *A.*2d 857.

Second, the New Jersey Supreme Court reexamined *N.J.S.A.* 40:72–1 in *Matthews v. Atlantic City*, 84 *N.J.* 153, 417 *A.*2d 1011 (1980). The Court acknowledged that *Stothers* had "rejected an equal protection challenge to the durational residency requirement" in that statute. *Id.* at 157, 417 *A.*2d 1011. Nonetheless, the Court considered the issue again based on "developments in constitutional law since *Stothers*," *id.* at 158, 417 *A.*2d 1011, namely *Bullock v. Carter*, 405 *U.S.* 134, 92 *S.Ct.* 849, 31 *L.Ed.*2d 92 (1972), and *Dunn v. Blumstein*, 405 *U.S.* 330, 92 *S.Ct.* 995, 31 *L.Ed.*2d 274 (1972). The Court agreed "that since this Court decided *Stothers*, state legislation affecting the electoral process has been subjected to closer constitutional scrutiny." *Matthews, supra*, 84 *N.J.* at 160–61, 417 *A.*2d 1011. The Court rejected both "strict scrutiny" and "minimal scrutiny," instead applying an intermediate level of scrutiny. *Id.* at 162–71, 417 *A.*2d 1011. The Court did not need to "resolve whether a two-year residency requirement passes constitutional muster," however. *Id.* at 171, 417 *A.*2d 1011. The Court instead ruled that "[t]he alleged

---

*Martini*, 6 *N.J.* 560, 567, 79 *A.*2d 857 (1951), "would support ... two years of residence." 44 *N.J.* at 171–73, 207 *A.*2d 665.

justifications for the residency requirement [in *N.J.S.A.* 40:72–1] lose meaning when it is observed that the statute applies to only 40 out of 567 municipalities," and that "the statute must fail" because the State had "failed to provide any sound justification why localities under [*N.J.S.A.* 40:72–1] and other forms of local government should be treated differently." *Id.* at 171–75, 417 A.2d 1011.[8]

As noted above, the Appellate Division directly rejected a challenge under the federal Equal Protection Clause to Paragraph 2's one-year durational residency requirement. *Ammond, supra,* 150 *N.J.Super.* at 9, 374 A.2d 498. However, as the New Jersey Supreme Court noted in *Matthews, supra,* 84 *N.J.* at 164, 417 A.2d 1011, *Ammond* did so by applying the "minimal scrutiny" standard used in *Stothers,* and apparently the "strict scrutiny" standard as well. *See Ammond, supra,* 150 *N.J.Super.* at 9, 374 A.2d 498. The Supreme Court later rejected the application of either of those standards to the durational residency requirement before it in *Matthews, supra,* 84 *N.J.* at 164–71, 417 A.2d 1011. Because *Ammond*'s constitutional standards of scrutiny were later rejected by the New Jersey Supreme Court, this court cannot simply follow *Ammond,* even though trial courts are normally bound by the opinions of the Appellate Division. *See Petrusky v. Maxfli Dunlop Sports Corp.,* 342 *N.J.Super.* 77, 81, 775 A.2d 723 (App. Div.2001).

Accordingly, in deciding whether the New Jersey Constitution's one-year district residency requirement violates the federal Equal Protection Clause, this court must treat as precedential the United States Supreme Court's rulings in *Hadnott, Chimento, Kanapaux,* and *Sununu,* and the New Jersey Supreme Court's ruling in *Matthews.* This court must give due respect to the District Court's ruling in *Robertson.* This court will first determine the level of scrutiny to be required, and then apply that level of

---

[8] This objection does not apply to Paragraph 2, which applies statewide to all candidates for Senate and General Assembly.

scrutiny to the merits, in both steps determining whether *Robertson*'s rulings are persuasive.

5. Under The New Jersey Supreme Court's Opinion In *Matthews,* The Residency Requirement Should Be Subject To Intermediate Scrutiny.

The initial and crucial determination is what level of constitutional scrutiny to apply to Paragraph 2's durational residency requirement. "First, then, we must determine what standard of review is appropriate." *Dunn, supra,* 405 *U.S.* at 335, 92 *S.Ct.* at 995, 31 *L.Ed.*2d at 274. The United States Supreme Court "has evolved more than one test, depending on the interests affected or the classification involved." *Id.* at 335, 92 *S.Ct.* at 995, 31 *L.Ed.*2d at 274. "[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Nordlinger v. Hahn,* 505 *U.S.* 1, 10, 112 *S.Ct.* 2326, 2331, 120 *L.Ed.*2d 1, 12 (1992). This is termed "minimal" or "rational basis" scrutiny. "Statutes are subjected to a higher level of scrutiny if they interfere with the exercise of a fundamental right, such as freedom of speech, or employ a suspect classification, such as race." *Regan v. Taxation with Representation,* 461 *U.S.* 540, 547, 103 *S.Ct.* 1997, 2001–02, 76 *L.Ed.*2d 129, 137 (1983). Such statutes "are unconstitutional unless the State can demonstrate that such laws are *'necessary* to promote a *compelling* government interest.'" *Dunn, supra,* 405 *U.S.* at 342, 92 *S.Ct.* at 995, 31 *L.Ed.*2d at 274. This is called "strict" scrutiny. In addition, the Court has adopted "intermediate scrutiny" for certain classifications such as gender, for which "it must be established at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Tuan Anh Nguyen v. INS,* 533 *U.S.* 53, 60–61, 121 *S.Ct.* 2053, 2059–60, 150 *L.Ed.*2d 115, 125–26 (2001) (citations and quotations omitted).

It is undisputed that Paragraph 2, which sets a durational residency requirement for candidates, does not classify "based on any 'suspect' criterion" such as race. *See Matthews, supra,* 84 *N.J.* at 161, 417 *A.*2d 1011. Rather, "[i]t draws a distinction between residents solely on the basis of length of residence." *Ibid.*

Nonetheless, the District Court in *Robertson* held that the United States Supreme Court's rulings in *Dunn* and *Bullock* required strict scrutiny because "[a] fundamental right is at stake." 150 *F.Supp.*2d at 695.

Although *Dunn* dealt with the fundamental right to vote, the Supreme Court [in *Bullock*] has held that restrictions on the right of persons to run for office can have an adverse impact on voters' right to vote, substantially limiting their choice of candidates. In those circumstances the state has impaired a fundamental right, and its actions must be subjected to strict scrutiny[.]

[*Id.* at 694.] [9]

This court must determine whether the District Court's choice of strict scrutiny is persuasive, "giv[ing] due respect to the decisions of the lower federal courts, particularly on questions involving the federal constitution." *Norflett, supra,* 67 *N.J.* at 286, 337 *A.*2d 609. To do so, this court will examine *Bullock, Dunn,* and the New Jersey Supreme Court's opinion in *Matthews.*

a. *Dunn* and *Bullock* do not support strict scrutiny here.

As the District Court noted, *Dunn* did not address the right to be a candidate. Rather, *Dunn* addressed the right to vote and the right to interstate travel, both of which are fundamental rights. 405 *U.S.* at 336–38, 92 *S.Ct.* at 999–1001, 31 *L.Ed.*2d at 280–82.

---

[9] The District Court also cited *Turner v. Fouche,* 396 *U.S.* 346, 362–63, 90 *S.Ct.* 532, 541–42, 24 *L.Ed.*2d 567, 579–81 (1970), which stated that candidates "have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications," and that "[t]he State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." *Turner* found it "unnecessary" to decide whether the strict or minimal scrutiny standard applied, however, because Georgia's requirement that school-board candidates must own real property must fall even under minimal scrutiny. *Id.* at 362, 90 *S.Ct.* at 541, 24 *L.Ed.*2d at 579–80.

Most importantly, *Dunn* considered residency requirements on voters. The state interests in residency requirements for legislators are far greater than those for voters, and voters' constitutional rights are more fundamental. *See, e.g., Walker v. Yucht,* 352 *F.Supp.* 85, 89–98 (D.Del.1972); *Draper v. Phelps,* 351 *F.Supp.* 677, 682–83 (W.D.Okla.1972).

The issue in *Dunn* was the constitutionality of Tennessee constitutional and statutory provisions which required every would-be voter to be " 'a resident of this State for twelve months, and of the county wherein such person may offer to vote for three months next preceding the day of election.' " 405 *U.S.* at 333 n. 1, 92 *S.Ct.* at 998 n. 1, 31 *L.Ed.*2d at 279 n. 1 (citations omitted). The Court found that strict scrutiny was required because of the fundamental interests involved: "Whether we look to the benefit withheld by the classification (the opportunity to vote) or the basis for the classification (recent interstate travel) we conclude that the State must show a substantial and compelling reason for imposing durational residence requirements." *Id.* at 335, 342, 92 *S.Ct.* at 999, 1003, 31 *L.Ed.*2d at 280, 284. The Court found the Tennessee provisions "too imprecise" to prevent fraud and "much too crude" to ensure knowledgeable voters. *Id.* at 351, 357–58, 360, 92 *S.Ct.* at 1007, 1010–11, 31 *L.Ed.*2d at 289, 292–94. Accordingly, the Court ruled: "Given the exacting standards of precision we require for statutes affecting constitutional rights, we cannot say that durational residency requirements are necessary to further a compelling state interest." *Id.* at 360, 92 *S.Ct.* at 1012, 31 *L.Ed.*2d at 294.

In *Bullock,* the United States Supreme Court ruled that, unlike the right to vote, the right to be a candidate was generally not a fundamental right. At issue was a Texas law that required would-be candidates to finance local primary elections by paying to the political party a filing fee of up to $8900, representing up to seventy-six percent of the annual salary of the position sought. 405 *U.S.* at 135–39 & n. 11, 145, 92 *S.Ct.* at 852–54, 856–57, 31 *L.Ed.*2d at 95–98, 101.

The *Bullock* Court stated that "[t]he threshold question to be resolved is whether the filing-fee system should be sustained if it can be shown to have some rational basis, or whether it must withstand a more rigid standard of review." *Id.* at 142, 92 *S.Ct.* at 855, 31 *L.Ed.*2d at 99. The Court noted:

In *Harper v. Virginia Board of Elections*, 383 *U.S.* 663, 86 *S.Ct.* 1079, 16 *L.Ed.*2d 169 (1966), the Court held that Virginia's imposition of an annual poll tax not exceeding $1.50 on residents over the age of 21 was a denial of equal protection. Subjecting the Virginia poll tax to close scrutiny, the Court concluded that the placing of even a minimal price on the exercise of the right to vote constituted an invidious discrimination. The problem presented by candidate filing fees is not the same, of course, and we must determine whether the strict standard of review of the *Harper* case should be applied.

[*Id.* at 142, 92 *S.Ct.* at 855, 31 *L.Ed.*2d at 99.]

The *Bullock* Court then ruled:

The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and *the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review.* However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. Texas does not place a condition on the exercise of the right to vote, nor does it quantitatively dilute votes that have been cast. Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. *The existence of such barriers does not of itself compel close scrutiny.* In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.

[*Id.* at 142–43, 92 *S.Ct.* at 855–56, 31 *L.Ed.*2d at 99–100 (citations omitted; emphasis added) ].

The Court in *Bullock* found, however, that "the very size of the fees imposed under the Texas system gives it a patently exclusionary character," which "would fall more heavily on the less affluent segment of the community, whose favorites would be unable to pay the large costs required by the Texas system" themselves or from contributions from less affluent voters, who would be "substantially limited in their choice of candidates." *Id.* at 143–44, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 99–100. The Court stressed that "we would ignore reality were we not to recognize that this system falls with unequal weight on voters, as well as candidates, accord-

ing to their economic status." *Id.* at 144, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100.

Even then, the Court in *Bullock* did not require that the State "demonstrate that such laws are 'necessary to promote a compelling governmental interest.'" *Dunn, supra,* 405 *U.S.* at 342, 92 *S.Ct.* at 1003, 31 *L.Ed.*2d at 284 (quoting *Shapiro v. Thompson,* 394 *U.S.* 618, 634, 89 *S.Ct.* 1322, 1331, 22 *L.Ed.*2d 600, 615 (1969)). Rather, the *Bullock* Court provided:

> Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper,* that the laws must be "closely scrutinized" and found *reasonably* necessary to the accomplishment of *legitimate* state objectives to pass constitutional muster.
>
> [*Bullock, supra,* 405 *U.S.* at 144, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100 (emphasis added).] [10]

The Court invalidated the Texas law, emphasizing that the economically exclusionary effect on candidates and "an undetermined number of voters" "are critical to our determination of constitutional invalidity." *Id.* at 149, 92 *S.Ct.* at 858–59, 31 *L.Ed.*2d at 103.

Thus, the United States Supreme Court's decisions in *Dunn* and *Bullock,* on which the District Court relied, did not hold that durational residency requirements on candidates required strict scrutiny, otherwise known as the "compelling-state-interest test," *Dunn,* 405 *U.S.* at 339–40, 92 *S.Ct.* at 1001–02, 31 *L.Ed.*2d at 282–83. As the New Jersey Supreme Court later noted in *Matthews, supra,* 84 *N.J.* at 159–60, 417 *A.*2d 1011, *Dunn* imposed strict scrutiny because the voter durational residency requirement directly "implicated two fundamental rights: the right to vote and

---

[10] *Bullock*'s quotation "closely scrutinized" apparently comes from *Harper,* which states that "where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized." *Harper, supra,* 383 *U.S.* at 670, 86 *S.Ct.* at 1083, 16 *L.Ed.*2d at 174. While this reference could suggest that the *Bullock* Court was requiring strict scrutiny, the actual language the Court employed in its test is to the contrary.

the right to travel." As *Matthews* also pointed out, *Bullock* showed that the United States Supreme Court "had never 'attached such fundamental status to candidacy as to invoke a rigorous standard of review.'" *Id.* at 158, 417 *A.*2d 1011 (quoting *Bullock, supra,* 405 *U.S.* at 142–43, 92 *S.Ct.* at 855–56, 31 *L.Ed.*2d at 99–100). Finally, as *Matthews* observed, while the exorbitant filing fees in *Bullock* "affected voters in ways 'neither incidental nor remote' and thus burdened voters 'according to their economic status,'" the United States Supreme Court used "a more exacting standard of review than the 'rational basis' standard," while still "[r]ejecting traditional strict scrutiny." *Id.* at 158–59, 417 *A.*2d 1011 (quoting *Bullock, supra,* 405 *U.S.* at 144, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100); *see also id.* at 169, 417 *A.*2d 1011 ("We do not agree with the dissent's view that *Bullock v. Carter* applied strict scrutiny"). Rather, *Matthews* noted, the United States Supreme Court adopted an "intermediate test" in *Bullock,* and used that same intermediate test in *Lubin v. Panish,* 415 *U.S.* 709, 94 *S.Ct.* 1315, 39 *L.Ed.*2d 702 (1974).[11] *Id.* at 170, 417 *A.*2d 1011.

 b. *Matthews's* standard is binding and persuasive.

 The New Jersey Supreme Court in *Matthews* certainly did not believe that *Dunn* and *Bullock* required strict scrutiny of durational residency requirements for candidates. The Court found that those cases required "closer constitutional scrutiny" than the minimal scrutiny applied in *Stothers,* but the Court rejected strict scrutiny for durational residency requirements. *Id.* at 157–60, 168–69, 417 *A.*2d 1011. The Court first noted that the statute before the Court "draws a distinction solely on the basis of length of residence," and thus "is not based on any 'suspect' criterion" that "would require . . . strict scrutiny." *Id.* at 161, 417 *A.*2d 1011.

---

11 *See Lubin, supra,* 415 *U.S.* at 718, 94 *S.Ct.* at 1320–21, 39 *L.Ed.*2d at 709–10 ("Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests."). *Lubin* also agreed that *Bullock* "involved filing fees that were so patently exclusionary as to violate traditional equal protection concepts." *Id.* at 715 n. 4, 94 *S.Ct.* at 1319, 39 *L.Ed.*2d at 708.

The Court next emphasized that "the right to be a candidate for office has never been held by either the United States Supreme Court or this Court to enjoy 'fundamental' status." *Ibid.* (citing *Bullock* and *Wurtzel* ). Indeed, the Court held that "[t]here is no fundamental right to run for office." *Id.* at 168, 417 A.2d 1011. The Court also ruled that the two-year residency requirement did not "penalize impermissibly the right to travel," even assuming that that "right includes *intra-state* as well as *interstate* travel." *Id.* at 168 & n. 7, 417 A.2d 1011.

The New Jersey Supreme Court rejected any "attempt to fit residency requirements into what is often called the 'two-tier' analysis of equal protection claims," that is, "strict scrutiny" and "minimal scrutiny." *Id.* at 164–65, 417 A.2d 1011. "The rigid assumption of this analysis—that legislative classification is either presumptively invidious or presumptively valid—offers little guidance in an area where important individual and governmental interests are in conflict." *Ibid.* The Court pointed out that the United States Supreme Court had employed an intermediate standard, for example, regarding gender-based classifications. *Id.* at 165–67, 417 A.2d 1011. The Court added: "In other cases calling for intermediate scrutiny, a fundamental right is substantially affected in an indirect manner. Thus, it has been held that restrictions on eligibility for elective office can indirectly infringe on the fundamental right to vote such that minimal scrutiny is not appropriate." *Id.* at 167, 417 A.2d 1011. Accordingly, the New Jersey Supreme Court held that "a durational residency requirement for candidates," which had an "indirect" impact on the fundamental right to vote, should be reviewed under an intermediate standard:

> [W]e hold that a requirement or restriction for candidates for elected office must be reasonably and suitably tailored to further legitimate governmental objectives. We believe this to be consistent with the approach outlines in *Bullock* of "examin[ing] in a realistic light the extent and the nature of [the] impact" on voters of barriers to candidacy. *Bullock,* 405 *U.S.* at 143 [92 *S.Ct.* 849]. It also comports generally with this Court's approach to minimum age requirements for candidates in *Wurtzel v. Falcey, supra.* See also *Gangemi,* 44 *N.J.* at 171 [207 *A.2d* 665].[ ]
> [*Id.* at 169, 417 A.2d 1011 (footnote and parallel citations omitted).]

■ Thus, the New Jersey Supreme Court in *Matthews* read *Dunn* and *Bullock* very differently from the District Court in *Robertson*. The *Matthews* Court rejected the strict scrutiny standard adopted by the District Court. The New Jersey Supreme Court instead decided that durational residency requirements for candidates should be reviewed using an intermediate standard of scrutiny.

This court is bound by the New Jersey Supreme Court's analysis, unless *Matthews* is no longer good law. *See Witczak*, *supra*, 421 *N.J.Super.* at 195, 23 *A.*3d 416. This court believes that *Matthews* was correct when decided, and remains good law. It has been reaffirmed by the New Jersey courts, and has not been superseded by subsequent United States Supreme Court opinions.

The New Jersey Supreme Court has continued to follow *Matthews*. In *Chamber of Commerce v. State*, 89 *N.J.* 131, 157–58, 445 *A.*2d 353 (1982), the Court cited *Matthews* for the proposition that there is "an intermediate" level of scrutiny, used where "a fundamental right is being substantially affected in an indirect manner," under which "the legislative classification must serve important governmental objectives and must be substantially related to achievement of those objectives." (citing *Bullock, supra*, 405 *U.S.* at 144, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100). In *McCann v. Clerk of Jersey City*, 167 *N.J.* 311, 325–26, 771 *A.*2d 1123 (2001), the Court, citing *Bullock* and *Matthews*, ruled that it "is well-settled" that "there is no fundamental right to be a candidate for public office." The Court upheld a statute disqualifying felons from candidacy by applying *Matthews'* intermediate standard " 'that a requirement or restriction for candidates for elective office must be reasonably and suitably tailored to further legitimate governmental objective.' " *Id.* at 327–32, 771 *A.*2d 1123 (quoting *Matthews, supra*, 84 *N.J.* at 169, 417 *A.*2d 1011).[12]

---

[12] *McCann* did state, however, that *Matthews* was addressing "the level of scrutiny afforded under the State equal protection standard." 167 *N.J.* at 325–

Since the New Jersey Supreme Court decided *Matthews*, the United States Supreme Court has not issued any opinions calling its analysis into question. To the contrary, the United States Supreme Court has since cited *Bullock* for the distinction between the fundamental right to vote and the right to be a candidate. *See, e.g., Clingman v. Beaver*, 544 *U.S.* 581, 593, 125 *S.Ct.* 2029, 161 *L.Ed.*2d 920, 934–35 (2005) ("[M]inor barriers between voter and party do not compel strict scrutiny"); *Burdick v. Takushi*, 504 *U.S.* 428, 433–34, 112 *S.Ct.* 2059, 119 *L.Ed.*2d 245, 252–53 (1992) ("[T]he mere fact that a State's system 'creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny' " (quoting *Bullock, supra,* 405 *U.S.* at 143, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100)); *see also Clements, supra,* 457 *U.S.* at 963–64 & n. 2, 102 *S.Ct.* at 2843–44, 73 *L.Ed.*2d at 515–16 (plurality opinion) ("Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny' " (quoting *Bullock, supra,* 405 *U.S.* at 143, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100)); *ibid. (Bullock* "departed from traditional equal protection analysis [*i.e.,*

26, 771 A.2d 1123; *see also id.* at 337–38, 771 A.2d 1123 (Coleman, J., concurring and dissenting). In fact, the New Jersey Supreme Court in *Matthews* made clear that "[t]he question presented is whether this restriction on eligibility for public office violates the Equal Protection Clause of the federal constitution, *U.S. Const.* Amend. XIV." *Matthews, supra,* at 155, 417 A.2d 1011. All of the Court's analysis in *Matthews* addressed the appropriate level of scrutiny under the federal Equal Protection Clause. *Id.* at 157–73, 417 A.2d 1011; *see id.* at 169, 417 A.2d 1011 ("The individual interests affected by the residency require-ment convince us that under federal constitutional law, something more than mere rationality is necessary to support the requirement."); *id.* at 171, 417 A.2d 1011 ("The exercise of this power, however, remains subject to the requirements imposed on the states by other provisions of the federal constitution—including the Equal Protection Clause."). The Court "conclude[d] that the durational residency requirement at issue violates the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 173–74, 417 A.2d 1011. The New Jersey Constitution was not mentioned regarding equal protection; indeed, Paragraph 2 was the only provision of the New Jersey Constitution that was ever men-tioned, and even then in passing. *Id.* at 169 n. 8, 417 A.2d 1011; *see also id.* at 177, 417 A.2d 1011 (Clifford, J., dissenting).

minimal scrutiny] because it "involve[d] classifications based on wealth").

Even if *Matthews'* analysis of the level of scrutiny was not binding on this court, this court finds the New Jersey Supreme Court's opinion in *Matthews* persuasive. Indeed, the reasons for using intermediate scrutiny to review durational residency requirements are many and powerful, and have persuaded other courts. *See e.g., Joseph v. Birmingham,* 510 *F.Supp.* 1319, 1327–36 (E.D.Mich.1981).

> c. *Robertson's* standard is not persuasive, because
> no fundamental rights are directly affected.

By contrast to *Matthews,* the District Court's analysis in *Robertson* is not persuasive, for several reasons. First, as set forth above, *Robertson* read *Dunn* and *Bullock* too broadly. For example, the District Court said *Bullock* held that "restrictions on the right of persons to run for office can have an adverse impact on voter's right to vote" such that "the state has impaired a fundamental right, and its action must be subjected to strict scrutiny." *Robertson, supra,* 150 *F.Supp.*2d at 694. In fact, as explained above, *Bullock* applied intermediate scrutiny. *Akron, supra,* 660 *F.*2d at 166.

Second, and more fundamentally, *Robertson* did not acknowledge that strict scrutiny applies only to restrictions which "interfere with the exercise of a fundamental right, such as freedom of speech, or employ a suspect classification, such as race." *Regan, supra,* 461 *U.S.* at 547, 103 *S.Ct.* at 2001–02, 76 *L.Ed.*2d at 137–38. Paragraph 2's one-year district residency requirement does not employ a suspect classification, nor does it directly impinge on any fundamental right. This is clear from examining the right to be a candidate, the right to vote, and the right to travel intra-state.

The right to be a candidate has never been held to be a fundamental right by either the United States Supreme Court or the New Jersey Supreme Court. *Bullock, supra,* 405 *U.S.* at 142–43, 92 *S.Ct.* at 855–56, 31 *L.Ed.*2d at 99–100; *Matthews, supra,* 84 *N.J.* at 161, 417 *A.*2d 1011. To impose strict scrutiny upon

Paragraph 2 because it affects candidates would treat the right to be a candidate as a fundamental right, even though "[t]here is no fundamental right to run for office." *Matthews, supra,* 84 *N.J.* at 168, 417 *A.*2d 1011.

Of course, as both the United States and New Jersey Supreme Courts recognize, restrictions on candidates can affect the fundamental right to vote. *Bullock, supra,* 405 *U.S.* at 142–43, 92 *S.Ct.* at 855–56, 31 *L.Ed.*2d at 99–100; *see also Matthews, supra,* 84 *N.J.* at 161–62, 169, 417 *A.*2d 1011. However, that effect is "indirect." *Matthews, supra,* 84 *N.J.* at 168, 417 *A.*2d 1011; *see also Bullock, supra,* 405 *U.S.* at 142–43, 92 *S.Ct.* at 855–56, 31 *L.Ed.*2d at 99–100. Moreover, the effect on the right to vote can vary widely, from a brief postponement of a candidacy, *Matthews, supra,* 84 *N.J.* at 162, 417 *A.*2d 1011, to the exclusion of a whole class of candidates and voters based on economic status, *Bullock, supra,* 405 *U.S.* at 143–44, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 100. The New Jersey Supreme Court properly adopted an intermediate standard that recognizes that this indirect effect on a fundamental right requires "closer constitutional scrutiny" than the minimal "rational basis" test, but less than the strict "compelling-state-interest" test, which would essentially prevent state regulation in an area where the State has an important state interest. *Matthews, supra,* 84 *N.J.* at 160, 162, 167–71, 417 *A.*2d 1011.

The right to travel interstate is a fundamental right, but that right is not implicated by Paragraph 2's one-year requirement to live in the district, particularly given its longer (and here unchallenged) state residency requirements. Rather, the requirement to live in the district affects only the right to travel intra-state, which is not a fundamental right, and is subject only to intermediate scrutiny. *Lutz v. York,* 899 *F.*2d 255, 256, 268–70 (3rd Cir.1990); *see also Callaway v. Samson,* 193 *F.Supp.*2d 783, 786 (D.N.J.2002) (applying intermediate scrutiny). Indeed, the District Court in *Robertson* declined to rely on the right to travel, stating that "[t]he State may well be correct" that it would not justify strict scrutiny because "[t]he fundamental right which is threatened . . . is not . . . the right to travel." 150 *F.Supp.*2d at 694, 695–96. In

any event, the New Jersey Supreme Court in *Matthews* found that a durational residency requirement did not "penalize impermissibly the fundamental right to travel," even assuming it was interstate. 84 *N.J.* at 168 & n. 7, 417 *A.*2d 1011.

Third, the District Court's analysis does not represent a uniform position on the part of the federal lower courts. *Cf. Dewey, supra,* 121 *N.J.* at 80, 577 *A.*2d 1239 ("lower-federal-court decisions ... should be accorded due respect, particularly where they are in agreement"). When the New Jersey Supreme Court decided *Matthews* in 1980, it noted that the lower federal courts were divided between those decisions that applied strict scrutiny and "those decisions which subjected durational residency requirements to traditional, minimal judicial scrutiny," so "a consistent pattern does not appear in judicial decisions." 84 *N.J.* at 162–65, 417 *A.*2d 1011. The same inconsistency persisted when the District Court decided *Robertson* in 2001. *See* 150 *F.Supp.*2d at 695. Indeed, that inconsistency continues even after *Robertson. See, e.g., Callaway, supra,* 193 *F.Supp.*2d at 784, 785–86 (despite *Robertson,* "the standard of review for violation of [candidates' and voters'] rights is uncertain," with a "labyrinth of conflicting decisions"; instead applying intermediate scrutiny).[13]

d. *Robertson* was not persuasive even in the same court.

Fourth, in the recent *Lewis* litigation, *Robertson*'s standard of scrutiny has not been followed even in its own district and circuit, even regarding Paragraph 2. The State ruled[14] that Fredrick

---

[13] *See also Cox v. Barber,* 275 *Ga.* 415, 568 *S.E.*2d 478, 480–81 & n. 14 (2002) ("Lower court opinions are inconsistent," including *Robertson,* and "there is no single standard to apply in evaluating residency requirements for candidates"; upholding statute as "rationally related"); *Campbell v. Tunny,* 196 *Misc.*2d 860, 864–65, 764 *N.Y.S.*2d 163 (N.Y.Sup.Ct.2003) (noting that while courts such as *Robertson* apply strict scrutiny, "[o]ther courts have found that the residency requirement need only be reasonably related to a rational state interest"; applying rational basis scrutiny).

[14] *Layton v. Lewis,* OAL Docket No. STE 4223–11, 2011 *WL* 1601325 (Sec'y of State April 26, 2011), *aff'd,* 2011 *WL* 1632039, 2011 *N.J.Super. Unpub. LEXIS* 1084 (App.Div. May 2, 2011), *certif. denied,* 207 *N.J.* 191, 23 *A.*3d 912 (2011).

Carlton "Carl" Lewis, a renowned athlete, could not be on the ballot for the primary for State Senate because he did not meet Paragraph 2's requirement that a person seeking to be a State Senator must "have been a resident of the State for four years." *N.J. Const.* art. IV, § 1, ¶ 2.[15] The District Court denied Lewis's motion for a temporary restraining order, rejecting Lewis's facial challenge that Paragraph 2's requirement violated the federal Equal Protection Clause. *Lewis v. Guadagno,* 837 *F.Supp.*2d 393, 395 & n. 2, 404 (D.N.J.2011) (*"Lewis I"*).[16] The Third Circuit's not precedential opinion left undisturbed the denial of the facial challenge, but found injunctive relief justified by an "as applied federal constitutional challenge." *Lewis v. Guadagno,* 2011 *WL* 1740608, *1, 2011 *U.S.App. LEXIS* 12834, *2 (3d Cir. May 5, 2011) (*"Lewis II"*). The Third Circuit permitted Lewis to appear on the primary ballot, and remanded the case for a determination of the merits of the "as applied challenge". *Ibid.*

On remand, the District Court ruled that Paragraph 2 was subject only to minimal scrutiny. *Lewis v. Guadagno,* 837 *F.Supp.*2d 404, 413 (D.N.J.2011) (*"Lewis III"*). The court reiterated that "there is no fundamental, unfettered right to pursue public office." *Id.* at 411 & n. 9 (citing *Bullock, supra,* 405 *U.S.* at

---

[15] Lewis had resided in the district for which he sought election for more than one year, so Paragraph 2's one-year district residency requirement was not at issue.

[16] The District Court ruled both that the United States Supreme Court's affirmance in *Sununu* was controlling precedent, and that, if it was not, Paragraph 2's requirement served a compelling state interest sufficient to survive even strict scrutiny. *Lewis, supra,* 837 *F.Supp.*2d at 395, 398–404. The District Court applied strict scrutiny largely "because the Court applied essentially the same reasoning of the District Court in *Sununu,* [so] it felt further bound to apply the heightened standard of review." *Ibid.* In fact, the majority of the judges in *Sununu* found that "the compelling state interest standard" did not apply, and indeed was not being applied in *Sununu, supra,* 383 *F.Supp.* at 1292–93 (Campbell and Gignoux, JJ., concurring); *see also Chimento,* 353 *F.Supp.* at 1218 & n. * (Campbell, J., concurring) ("Nothing in *Bullock* would seem to require extension of the stricter standard to a limitation of the present character").

142–43, 92 *S.Ct.* at 855–56, 31 *L.Ed.*2d at 99–100). The court found that *Dunn* "had nothing to do with candidates running for office," and that *Bullock*, concluded that "a restriction placed upon political candidates does not warrant heightened scrutiny unless the restriction substantially interferes with or disrupts the right to vote, severely distorts the political playing field, or otherwise offends another constitutional right." *Id.* at 411. The court ruled that, unlike the patently exclusionary fees in *Bullock*, Paragraph 2's four-year state residency requirement "does not shrink the pool of political candidates so profoundly, and on such arbitrary or impermissible grounds as financial status ... as to undermine fundamental rights and privileges, including the right to vote," and thus only had to have a rational basis. *Id.* at 412 & n. 8.

On appeal, the Third Circuit's not precedential opinion affirmed the District Court's judgment, acknowledging that it had applied a rational basis review. *Lewis v. Guadagno*, 445 *Fed.Appx.* 599, 600, 601 (3d Cir.2011) (*"Lewis IV"*). The Court of Appeals stated that Lewis "proceeds from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny." *Id.* at 603 (quoting *Burdick, supra*, 504 *U.S.* at 432, 112 *S.Ct.* at 2062, 119 *L.Ed.*2d at 252). The Third Circuit noted that " '[u]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.' " *Id.* at 601 n. 6 (quoting *Nordlinger, supra*, 505 *U.S.* at 10, 112 *S.Ct.* at 2331–32, 120 *L.Ed.*2d at 10). The Court of Appeals noted that "there is no contention that Lewis is in a suspect class," and agreed that "the Supreme Court has rejected the argument that an individual has a fundamental right to candidacy." *Id.* at 601 n. 6, 603 (citing *Bullock, supra*, 405 *U.S.* at 142–43, 92 *S.Ct.* at 855–56, 31 *L.Ed.*2d at 99–100).

Of course, this court is not bound by these unpublished lower federal court decisions. It is telling, however, that both the

District Court and the Court of Appeals in *Lewis* ultimately refused to apply strict scrutiny to the four-year state residency requirement in Paragraph 2, despite *Robertson*'s application of strict scrutiny to Paragraph 2's one-year district residency requirement. *See Lewis I, supra,* 837 *F.Supp.*2d at 402.[17] If a district judge from the same district, and the Court of Appeals in the same circuit, were not ultimately persuaded by *Robertson*'s standard of scrutiny, then this court is similarly unpersuaded.

At the same time, this court does not believe it appropriate to apply minimal scrutiny, as adopted in *Lewis IV* and advocated by the Attorney General here. As explained above, the fundamental right to vote is indirectly affected by restrictions upon candidacy, the right to intrastate travel merits intermediate scrutiny, and the right to be a candidate is directly implicated. This court finds the New Jersey Supreme Court's adoption in *Matthews* of intermediate scrutiny for durational residency requirements is both persuasive and binding.

> 6. The One–Year District Residency Requirement
> Meets Intermediate Scrutiny.

Accordingly, this court will follow the intermediate standard of scrutiny adopted in *Matthews,* and will determine whether the one-year residency requirement in Paragraph 2 is "reasonably and suitably tailored to further legitimate governmental objectives." *Matthews, supra,* 84 *N.J.* at 169, 417 *A.*2d 1011. This court will then consider whether the result in *Robertson* is persuasive.

> a. Paragraph 2 furthers legitimate state interests.

This court "begin[s] application of this standard of constitutional scrutiny by assessing the State interests" furthered by the one-year residency requirement of Paragraph 2. *Matthews,*

---

[17] The District Court, moreover, cited *Robertson* only to distinguish it as an "intrastate case," opining that "federal constitutional concerns ... may be more pronounced" in intrastate cases. *Lewis I, supra,* 837 *F.Supp.*2d at 402. In fact, as set forth above, the federal constitutional concerns are more pronounced where the fundamental right of intrastate travel is affected.

*supra,* 84 *N.J.* at 170, 417 *A.*2d 1011. The governmental objectives underlying the one-year residency requirement in Paragraph 2 were described in the Attorney General's brief filed May 21, 2001. That brief stated: in *Robertson.* "This long-standing Constitutional provision" furthers "the State's legitimate interest in assuring that a candidate for State legislative office has a sufficient durational nexus to his or her legislative district, to be familiar with the issues of concern to its residents, and to allow the electorate to become familiar with the candidate." *Id.* at 1. This "allows a candidate the issues and concerns that are important to the people he or she seeks to represent," while allowing the people "the necessary opportunity to become familiar with a potential candidate." *Id.* at 14. "The one year district residency requirement, therefore, enhances the State's fundamental interest in an informed electorate and responsive, knowledgeable representatives." *Id.* at 1.

Respondent stresses that the Attorney General's December 8, 2011, brief in this instant case did not advance any reasons in support of Paragraph 2. In her December 30, 2011, brief, however, the Attorney General has reiterated that "[t]his requirement has been recognized as furthering the following dual state interests: 1) a candidate's familiarity with public issues and concerns and 2) the electorate's knowledge of the candidate and his or her electoral positions." *Id.* at 8. Moreover, whether or not the Attorney General repeats them, this court must consider the reasons why the drafters and ratifying voters enshrined this one-year residency requirement in the New Jersey Constitution, just as other courts reviewing Paragraph 2 have done. *See, e.g., Robertson, supra,* 150 *F.Supp.*2d at 696; *Ammond, supra,* 150 *N.J.Super.* at 5, 374 *A.*2d 498 (Paragraph 2's one-year district residency requirement serves "legitimate state goals"). *See also Lewis III, supra,* 837 *F.Supp.*2d at 414 (these two educational functions "[u]nquestionably" constitute "a rational basis for the policy encompassed by" Paragraph 2).

As the Attorney General also noted in his brief in *Robertson,* "[t]he courts have recognized that a durational requirement serves" a third state interest, namely "preventing 'political carpet bagging.' " (quoting *Sununu, supra,* 383 *F.Supp.* at 1290). This refers to the state objective "to prevent frivolous candidacy by persons who have little previous exposure to the problems and desires of the people." *Chimento, supra,* 353 *F.Supp.* at 1215. The District Court in *Robertson* addressed all three interests. 150 *F.Supp.*2d at 696.

 The New Jersey Supreme Court has made clear that these are all legitimate governmental objectives. "Protecting the integrity of the ballot is a valid governmental objective." *Matthews, supra,* 84 *N.J.* at 170, 417 *A.*2d 1011 (citing *Bullock, supra,* 405 *U.S.* at 145, 92 *S.Ct.* at 856, 31 *L.Ed.*2d at 99). "The power to prescribe qualifications for state political office, retained by the states under the Tenth Amendment, is a permissible means by which to further this objective." *Id.* at 170–71, 417 *A.*2d 1011 (citing *Oregon v. Mitchell,* 400 *U.S.* 112, 91 *S.Ct.* 260, 27 *L.Ed.*2d 272 (1970)). *Matthews* explained:

> [A] durational residency requirement is directed at maintaining the integrity of the ballot by preventing fraudulent and frivolous candidacies. It ensures that candidates have some knowledge of local affairs and, conversely, that local voters have an opportunity to learn about a candidate to intelligently assess his fitness for office. Properly drawn, a durational residency requirement is directed at providing a sufficient period of time for these two "educational" functions to take place.

[*Id.* at 170, 417 *A.*2d 1011.]

 The United States Supreme Court has also indicated the legitimacy of such state goals. First, " 'a State has an interest, if not a duty, to protect the integrity of its political process from frivolous or fraudulent candidacies.' " *Storer v. Brown,* 415 *U.S.* 724, 733, 94 *S.Ct.* 1274, 1280, 39 *L.Ed.*2d 714, 725 (1974) (quoting *Bullock, supra,* 405 *U.S.* at 145, 92 *S.Ct.* at 857, 31 *L.Ed.*2d at 101). "Certainly the State has a legitimate interest in fostering an informed electorate." *Eu v. San Francisco Cnty. Democratic Cent. Comm.,* 489 *U.S.* 214, 228, 109 *S.Ct.* 1013, 1022–23, 103 *L.Ed.*2d 271, 285 (1989); *accord Wash. State Grange v.*

*Wash. State Republican Party*, 552 *U.S.* 442, 458, 128 *S.Ct.* 1184, 1195–96, 170 *L.Ed.*2d 151, 165–66 (2008). The State's interest that voters "have an opportunity to observe, learn about and appraise those who seek to be candidates" was the rationale advanced for the durational residency requirement upheld by the United States Supreme Court in *Hadnott, supra*, 320 *F.Supp.* at 119–21, *aff'd*, 401 *U.S.* 968, 91 *S.Ct.* 1189, 28 *L.Ed.*2d 318. All three rationales were advanced for the state durational residency requirements in the New Hampshire Constitution, which were upheld by the United States Supreme Court. *See Chimento, supra*, 414 *U.S.* 802, 94 *S.Ct.* 125; *Sununu, supra*, 420 *U.S.* 958, 95 *S.Ct.* 1346.

Thus, the two state interests advanced by the Attorney General, and the third state interest identified by the courts, have been held to be "legitimate governmental objectives" by the Supreme Courts of New Jersey and the United States. *See Matthews, supra*, 84 *N.J.* at 169, 417 *A.*2d 1011.

b. Paragraph 2 is reasonably and suitably tailored.

Under *Matthews*, the next step is to consider whether the one-year district residency requirement is "reasonably and suitably tailored to further [these] legitimate governmental objectives." *Id.* at 169, 417 *A.*2d 1011. The New Jersey Supreme Court provided further guidance:

> Once a residency requirement is found justified, the precise time period selected by the Legislature need only fall within a reasonable range. A more stringent requirement would place upon the State the virtually impossible burden of showing that a particular number of months or years, as opposed to some other length of time, is constitutionally permissible. "[T]o test the power to establish * * * qualification[s] by the 'compelling interest' standard is really to deny a State any choice at all, because no State could demonstrate a 'compelling interest' in drawing the line * * * at one point rather than another." *Oregon v. Mitchell*, 400 *U.S.* 112, 294–295, 91 *S.Ct.* 260, 349, 27 *L.Ed.*2d 272, 379 (1970) (Stewart, J., concurring in part and dissenting in part). After determining that the Legislature has selected a reasonable time period, our inquiry is at an end.
>
> [*Id.* at 171, 417 *A.*2d 1011].

*See also Sununu, supra*, 383 *F.Supp.* at 1290–91 (for a court to decide whether the number of years chosen by the State was constitutional would lack "any discernable judicial standards, [and]

would be an improper intervention into an area reserved to the states by the Tenth Amendment"); *Lewis I, supra,* 837 *F.Supp.*2d at 403–04 (similar).

> i. The long and repeated inclusion of the one-year residency requirement in the New Jersey Constitution deserves respect.

It is "important" that "the residency requirement in question is contained in the Constitution of the State." *Chimento, supra,* 353 *F.Supp.* at 1216. As the District Court in *Lewis* noted regarding Paragraph 2, "state constitutions are different than other forms of state action" because "the provisions of a state constitution reflect the direct vote of the citizens." *Lewis III, supra,* 837 *F.Supp.*2d at 416 n. 16. State constitutions deserve respect because their rigorous approval processes and relative permanence ensures that they represent carefully considered state policy, rather than temporary maneuverings for political advantage. Here, the drafters of the New Jersey Constitution, and the voters who thereafter ratified it, have repeatedly chosen a one-year residency requirement for members of the Senate and General Assembly.

The one-year residency requirement has been in the New Jersey Constitution since its original adoption in July 2, 1776. *See* Robert F. Williams, *The New Jersey State Constitution: A Reference Guide,* at 1 (1997 ed.) ("Williams"). The 1776 Constitution created a Legislative Council and a General Assembly, and required candidates for each to "have been, for one whole year next before the election, an inhabitant and freeholder in the county he is to represent." *N.J. Const. of 1776* art. III.

In 1844, a constitutional convention drafted, and New Jersey voters overwhelmingly ratified, a revised Constitution. Williams, *supra,* at 6–7. The 1844 Constitution replaced the Legislative Council with the Senate, added the four-year and two-year state residency requirements for members of the Senate and General Assembly respectively, removed the "freeholder" requirement, and readopted the one-year county residency requirement from the 1776 Constitution. *N.J. Const. of 1844* art. IV, § 1, ¶ 2. The

language of this provision of the 1844 Constitution was precisely the same as the current Paragraph 2, except it required the candidates to have lived for one year in the "county." Compare *N.J. Const. of 1844* art. IV, § 1, ¶ 2 with *N.J. Const.* art. IV, § 1, ¶ 2.

In 1947, a constitutional convention drafted, and New Jersey voters again overwhelmingly ratified, a model constitution. Williams, *supra,* at 13–17. They adopted Paragraph 2 without change. *N.J. Const.* art. IV, § 1, ¶ 2 (1947). In 1966, as detailed below, a constitutional convention proposed, and New Jersey voters ratified, amendments that preserved the one-year residency requirement by changing "county" to "district" in Paragraph 2. *N.J. Const.* art. IV, § 1, ¶ 2. Paragraph 2 has continued unchanged to the present.

Thus, respondent "is asking us to strike down a constitutional provision that was drawn by the framers" of New Jersey's original constitution. *See Chimento, supra,* 353 *F.Supp.* at 1217. Furthermore, the "merit and political wisdom" of the one-year residency requirement has thereafter been considered and readopted, three times, by the people of New Jersey. *See Sununu, supra,* 383 *F.Supp.* at 1291. To paraphrase *Sununu,* "[i]t would be presumptuous for this court to engage in judicial hypothesizing in order to hold unconstitutional a provision" which has been in New Jersey's constitution since 1776, and has been considered and approved by New Jersey's voters in 1844, 1947, and 1966. *Id.* at 1291; *See Lewis I, supra,* 837 *F.Supp.*2d at 400, 404 & n. 17 (similarly refusing to overturn Paragraph 2's state residency requirement, added in 1844, because it "was at least twice approved by voters in a direct vote and existent in the constitution for more than 150 years"); *Lewis III, supra,* 837 *F.Supp.*2d at 414.

> ii. Like the Senate, the General Assembly is an important State representative institution meriting residency requirements.

Almost every state has enacted durational residency requirements for state legislators. *Hayes v. Gill,* 52 *Haw.* 251, 473 *P.*2d

872, 877–79 (1970). Forty-four states, and the United States Constitution, require candidates for the legislature to have residence of a year or more. *Brewster v. Johnson*, 260 *Ark.* 450, 541 *S.W.*2d 306, 307, 309 (1976). Like the federal constitution, and most states, New Jersey has provided such residency requirements for both houses of the Legislature.

The United States Supreme Court in *Sununu* has held that a state can constitutionally impose durational residency requirements on state senators. With the exception of *Robertson*, every court to reach the issue has held that a state can constitutionally have durational residency requirements for state representatives. *See, e.g., Walker, supra,* 352 *F.Supp.* 85, 98–100 (upholding residency requirements for representatives of three years in the state, and one year in the district); *Draper,* 351 *F.Supp.* at 679–86 (upholding six-month district residency requirement for state representatives); *Gilbert v. State,* 526 *P.*2d 1131, 1132–36 (Alaska 1974) (upholding residency requirements for senators and representatives of three years in the state, and one year in the district); *Brewster,* 541 *S.W.*2d at 307, 310 (upholding residency requirements for senators and representatives of two years in the state, and one year in the district); *Hayes,* 473 *P.*2d at 874–75, 877–79 (upholding three-year state residency requirements for senators and representatives); *McConnell v. Marshall,* 467 *S.W.*2d 318, 319–20 (Ky.Ct.App.1971) (upholding one-year district residency requirement for state representatives); *White v. Manchin,* 173 *W.Va.* 526, 318 *S.E.*2d 470, 487–91 (1984) (listing cases).

Members of the General Assembly are "key officers in the State Government." *Stothers, supra,* 6 *N.J.* at 567, 79 *A.*2d 857. Indeed, each pair of members of the General Assembly represent far more voters (about 220,000) than did a New Hampshire Senator (about 32,000) in *Sununu. See Chimento, supra,* 353 *F.Supp.* at 1215 n. 8.

There are, of course, "some differences" between the two houses of a state legislature. *Id.* at 1293 n. 3 (Campbell, J., with Gignoux, J., concurring). However, they are differences in degree, not in

kind. In New Jersey, both the Senate and the General Assembly share "[t]he legislative power," and the exercise of that power is the primary role of both bodies. *N.J. Const.* art. IV, § 1, ¶ 1.[18] Their powers differ in only a few particulars. Like the United States House of Representatives, only the General Assembly can originate bills for raising revenue. *U.S. Const.* art. I, § 7, ¶ 1; *N.J. Const.* art. IV, § 6, ¶ 1. Like the United States Senate, only the New Jersey Senate can give advice and consent on executive nominations. *U.S. Const.* art. II, § 2, ¶ 2; *N.J. Const.* art. V, § 4, ¶ 2; *N.J. Const.* art. VI, § 6, ¶ 1; *N.J. Const.* art. VII, § 2, ¶ 1. Only the General Assembly can impeach a state officer, and only the Senate can try the impeachment, just like the federal House and Senate respectively. *U.S. Const.* art. I, § 2, ¶ 4; *U.S. Const.* art. I, § 3, ¶ 6; *N.J. Const.* art. VII, § 3, ¶ 2. These few differences in powers hardly justify treating the two houses of the Legislature so differently that durational residency can constitutionally be required for one house and not the other house.

The principal distinctions between the General Assembly and the Senate are that (1) in each legislative district, there are two members of the General Assembly but one senator; and (2) the members of the General Assembly serve two-year terms while senators serve four-year terms. *N.J. Const.* art. IV, § 2, ¶¶ 1–4. There are even greater disparities between federal representatives and senators in numbers (435 versus 100 members) and length of term (two versus six years). *U.S. Const.* art. I, § 2, ¶ 1; *U.S. Const.* art. I, § 3, ¶ 1. Nonetheless, the United States Constitution establishes national durational residency requirements for both, with the length slightly higher for senators (nine years) than for representatives (seven years). *U.S. Const.* art. I, § 2, ¶ 2; *U.S. Const.* art. I, § 3, ¶ 3. The New Jersey Constitution in

---

18 In addition, if there is a tie in the election for Governor, "a majority of both houses in [a] joint meeting" select the winner. *N.J. Const.* art. V, § 1, ¶ 4. The President of the Senate and the Speaker of the General Assembly are both in the line of succession if both the Governor and Lieutenant Governor are absent or unable to serve. *N.J. Const.* art. V, § 1, ¶¶ 6, 7.

Paragraph 2 establishes similarly gradated state residence re-
quirements for members of both the Senate (four years) and
General Assembly (two years). *N.J. Const.* art. IV, § 1, ¶ 2; *see
also Lewis I, supra,* 837 *F.Supp.*2d at 402 n. 15. If the United
States Constitution permits such residency requirements for fed-
eral representatives as well as senators, it is unlikely to forbid
states from establishing residency requirements for state repre-
sentatives while permitting residency requirements for state sena-
tors under *Sununu.*

 iii. It is appropriate to require a candidate for the General
 Assembly to have resided for one year in the District
 she seeks to represent.

While *Sununu* dealt with a requirement to live in the state, it is
also appropriate to require candidates to live in the district and
among the people they seek to represent. The United States
Supreme Court has held that a state can constitutionally require
that a state elected official reside for a substantial period before
election in the district in which he is running for office. *Hadnott,
supra,* 401 *U.S.* 968, 91 *S.Ct.* 1189, 28 *L.Ed.*2d 318. *Hadnott*
addressed a provision of the Alabama Constitution that required
candidates for circuit court-trial courts of general jurisdiction
divided into thirty-seven circuits throughout the State [19]—to live
for one year before his election in the circuit for which he seeks
election. *Hadnott, supra,* 320 *F.Supp.* at 119. It would be
anomalous indeed if a state could impose a requirement that a
candidate for state trial judge live for a period in the district from
which he is seeking election, but not require a candidate for the
New Jersey General Assembly, who (unlike a judge) is actually a
representative of the voters of his district, to live for a period in
the district he seeks to represent.

Further, New Jersey's district residency requirement is only
one year. *N.J. Const.* art. IV, § 1, ¶ 2. That is far shorter than
the seven-year state residency requirement for state senators

---

[19] *Ala. Const.* art. VI, § 139.

upheld by the United States Supreme Court in *Sununu, supra,* 420 *U.S.* 958, 95 *S.Ct.* 1346. Numerous courts have since upheld such short requirements. *See e.g., Akron, supra,* 660 *F.*2d at 167–69 (upholding one-year ward residency requirement); *Brewster, supra,* 541 *S.W.*2d at 307, 310; *Cox v. Barber,* 275 *Ga.* 415, 568 *S.E.*2d 478, 481–82 & n. 14 (2002) (upholding one-year district residency requirement, despite Robertson); *Blount v. Board of Supervisors,* 247 *Md.* 342, 230 *A.*2d 639 (1967) (upholding one-year district residency requirement).

The original drafters of this requirement in the New Jersey Constitution obviously felt that one year was the minimum period for the candidates for either house to get to know the voters of the district, and for the voters of the district to get to know the candidate. Indeed, as set forth below, the voters of New Jersey have approved of this one-year residency requirement three times since its original adoption. If "the precise time period selected by the Legislature need only fall within a reasonable range," this one-year period repeatedly selected by the drafters and ratifying voters of the New Jersey Constitution certainly does so. *See Matthews, supra,* 84 *N.J.* at 171, 417 *A.*2d 1011.

iv. Paragraph 2 imposes minimal burdens.

The one-year period appears particularly reasonable when considered against its impact on "the individual interests affected by the classification." *See Dunn, supra,* 405 *U.S.* at 335, 92 *S.Ct.* at 999, 31 *L.Ed.*2d at 280. As set forth above, respondent raises three such interests: the right to be a candidate; the right to vote; and the right to intra-state travel.

First, Paragraph 2 does not burden the non-fundamental right to be a candidate for very long. Like Paragraph 2's minimum age requirement, upheld by the New Jersey Supreme Court in *Wurtzel, supra,* Paragraph 2's one-year residency requirement does "not permanently exclude any candidate." 69 *N.J.* at 404, 354 *A.*2d 617 (upholding a three-year wait). Rather, it only "delays the eligibility of a candidate" for General Assembly until he has been a resident of the district for one year, "a minimal infringe-

ment" on the right to be a candidate. *See Chimento, supra,* 353 *F.Supp.* at 1216–17 (seven-year residency requirement "does not seriously impair the participation of the [candidate] in the election process"); *Lewis III, supra,* 837 *F.Supp.*2d at 416, 418 (Paragraph 2's four-year state residency requirement "does not preclude, but merely delays, candidacy for a particular state office" for "a relatively short temporal period," and thus imposes only a "minimal, incidental burden"); *see also Clements, supra,* 457 *U.S.* at 967, 971–72, 102 *S.Ct.* at 2847–48, 73 *L.Ed.*2d at 521–22 (plurality opinion) (a "waiting period" of up to two years before a current officeholder could become a candidate for another office posed only an "insignificant" and "*de minimis* burden" on the right to candidacy, and was "hardly a significant barrier to candidacy." (citing *Chimento, supra,* 414 *U.S.* 802, 94 *S.Ct.* 125)).

Second, as in *Matthews, supra,* 84 *N.J.* at 168, 417 *A.*2d 1011. "[t]he residency requirement before us does not directly interfere with the exercise of the fundamental right to vote." Unlike the patently exclusionary fees in *Bullock, supra,* 405 *U.S.* at 142, 92 *S.Ct.* at 855, 31 *L.Ed.*2d at 99, which affected a substantial number of less affluent candidates and thus less affluent voters, Paragraph 2 affects only those few candidates who have moved their residence into a different district within one year of the election. " 'While an isolated few may be *temporarily* precluded from seeking the office of [General Assembly], this cannot be said to adversely affect the democratic election process or the voters' participation therein.' " *See Sununu, supra,* 383 *F.Supp.* at 1292 (quoting *Chimento, supra,* 353 *F.Supp.* at 1218 (emphasis by court)). The seven-year state residency requirement for state senators in *Sununu* was held to pose only "minimal interference with [voters'] right to cast an effective vote." *Sununu, supra,* 383 *F.Supp.* at 1292; *accord Chimento, supra,* 353 *F.Supp.* at 1217. Similarly, the District Court in *Lewis* ruled that Paragraph 2's four-year state residency requirement "has nothing more than a minor, incidental impact on the rights of citizens to vote." *Lewis III, supra,* 837 *F.Supp.*2d at 413; *see also Lewis IV, supra,* 445

*Fed.Appx.* at 603. Here, Paragraph 2's one-year district residency requirement has even less effect on the right to vote.

Third, Paragraph 2 imposes no great burdens on the right to travel intrastate, which is not a fundamental right. Longer residency requirements have been held not to violate even the fundamental right of interstate travel. *Sununu, supra,* 383 *F.Supp.* at 1291–92 (seven-year state residency requirement for Senate "does not constitutionally interfere with plaintiff's right to interstate travel") *Lewis III, supra,* 837 *F.Supp.*2d at 412 n. 10 (Paragraph 2's four-year state residency requirement "cannot be said to violate Plaintiff's right to travel" interstate); *See Matthews, supra,* 84 *N.J.* at 167 & n. 7, 417 *A.*2d 1011 (two-year residency requirement does not "penalize impermissibly the fundamental right to travel" interstate). If "the relationship between [New Hampshire's] seven year residency requirement and the right to travel [interstate] is far too attenuated to constitute any infringement of that right," *Chimento, supra,* 353 *F.Supp.* at 1218, then surely Paragraph 2's one-year district residency requirement does not infringe upon the right to intra-state travel.

The reasonableness of the one-year period, and its focus on members of the State Legislature, indicate that Paragraph 2 is "reasonably and suitably tailored to further [its] legitimate governmental interests" in ensuring that candidates and the district voters have the opportunity to learn about each other before the election. *Matthews, supra,* 84 *N.J.* at 169, 417 *A.*2d 1011. It requires only that candidates reside in the legislative district they seek to represent, for a period of only one year immediately prior to their election. *See Sununu, supra,* 383 F.Supp. at 1290 (seven-year state residency requirement is "constitutionally 'tailored' to the state's legitimate objectives").

Accordingly, considering the binding United States Supreme Court precedent, and applying the test set forth by the New Jersey Supreme Court in *Matthews,* the New Jersey Constitution's one-year district residency requirement does not violate the Equal Protection Clause. The requirement furthers "legitimate

governmental objectives"; it is "reasonably and suitably tailored" to do so; and "the precise time period selected by the [Constitution appears to] fall within a reasonable range." *Matthews, supra,* 84 *N.J.* at 169, 171, 417 *A*.2d 1011.

7. *Robertson's* result and rationale are unpersuasive.

This court must now consider *Robertson* to determine whether its reasons for voiding Paragraph 2 are persuasive. The District Court's choice of strict scrutiny was a crucial, and incorrect, part of its analysis, and taints many of its rationales. Examination of *Robertson,* moreover, shows that its conclusion is anomalous and its analysis is flawed.

i. *Robertson's* ruling is an anomaly.

Robertson's ruling is indeed without precedent before or since. As set forth above, in case after case, courts have sustained residency requirements for state legislators. *See e.g., Walker, supra,* 352 *F.Supp.* at 98–100 (upholding Delaware's residency requirements for representatives of three years in the state, and one year in the district). No other court, even in the unguided flurry before *Chimento* and *Sununu,* has ever held such a legislative residency requirement was unconstitutional. Indeed, "no court has held unconstitutional a residency requirement for a statewide elective office," *Sununu, supra,* 383 *F.Supp.* at 1290 n. 3, except Robertson and a "close" case about a bizarre ten-year residency requirement for the ministerial post of state auditor, *Antonio v. Kirkpatrick,* 579 *F*.2d 1147, 1150–51 (8th Cir.1978). With those same two exceptions, "courts have consistently upheld *state* constitutional durational residency requirements." *White, supra,* 318 *S.E*.2d at 487–90. Moreover, "in the decisions considering one year residency requirements, the overwhelming majority have upheld the challenged laws." *Joseph v. Birmingham,* 510 *F.Supp.* 1319, 1325–27 (E.D.Mich.1981). Finally, since the Sixth Circuit's 1981 opinion in *Akron, supra,* 660 *F*.2d 166, highlighted the Supreme Court's summary rulings in *Sununu* and *Chimento,* "no federal court has struck down a durational residency require-

ment for political office," *Schiavone v. DeStefano,* 48 *Conn.Supp.* 521, 852 *A.*2d 862, 867 (Conn.Super.2001)—except *Robertson.*

 ii. *Robertson* discounted the legitimate State interests.

Moreover, the District Court in *Robertson* gave short shrift to the State's legitimate governmental objectives. The court found that they were not "compelling." *Robertson, supra,* 150 *F.Supp.*2d at 696–97. As explained above, that is not the applicable standard. The court also asserted the "insubstantiality of these purported State objectives." *Id.* at 697. The court's attacks on the State's legitimate interests, however, are unpersuasive.

First, the District Court noted that the State was divided into many districts from which Senators and General Assembly members were elected. *Ibid.* That is a reason for, not against, a requirement that a candidate reside for a period in the district. While a senator or assembly member has statewide powers, it is the people in the District that the member represents. Though New Jersey is a small state, it is also a diverse one, with differing interests between north and south, rural and urban, shore and mountain. A candidate from one of those areas (e.g., Cape May) is not necessarily knowledgeable about, or known in, other diverse districts in the State (e.g., Newark). New Jersey is also a populous state, with each legislative district containing about 220,000 people. It is hardly an insubstantial interest, with such large and diverse districts, to require persons newly arrived in a district to spend time learning about, and becoming known to, the district population they seek to represent.

Second, the District Court objected that a short distance separates each district from the next, but that is inherent in linedrawing. The court also objected that the districts sometimes subdivide cities or geographical regions, such as the Passaic Valley. *Id.* at 697–98. Both objections are also true for New Jersey's state boundaries, which divide up the Delaware Valley, and the New York and Philadelphia metropolitan areas. Using the District Court's rationale, residents just across the Delaware, Pennsylvania, or New York state line might object that it was

unfair to exclude them as candidates in New Jersey districts a bridgespan away. Despite such objections, the *Lewis* decisions have reiterated for New Jersey what the United States Supreme Court's affirmances in *Chimento* and *Sununu* established for New Hampshire: that states may constitutionally insist that a candidate live for a time on the right side of a boundary line.

### iii. Paragraph 2 was changed to comply with the federal Equal Protection Clause.

Third, the District Court in *Robertson* pointed out that "the boundaries of these districts are not firmly established," because "they are subject to revision every ten years to ensure that they meet one-person one-vote requirements and other statutory mandates." *Robertson, supra,* 150 *F.Supp.*2d at 697. This is a real issue, but one created to comply with the federal Equal Protection Clause. Prior to 1966, Paragraph 2 was worded as it is now, except that it did not refer to a "district"; instead, it required candidates for the Senate and General Assembly to be a citizen and resident "of the county for which he shall be elected one year, next before his election." *N.J. Const.* art. IV, § 1, ¶ 2 (1947). Because county boundaries seldom change, the original Paragraph 2 did not present the concern raised by the District Court.

In 1964, the United States Supreme Court held that the federal Equal Protection Clause required "one person, one vote," and therefore that "the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds v. Sims,* 377 *U.S.* 533, 568, 84 *S.Ct.* 1362, 1385, 12 *L.Ed.*2d 506, 531 (1964); *see Baker v. Carr,* 369 *U.S.* 186, 82 *S.Ct.* 691, 7 *L.Ed.*2d 663 (1962). In response, the New Jersey Supreme Court found unconstitutional the apportionment provisions of the New Jersey Constitution, held that the Senate and the General Assembly had to be apportioned by population rather than by county, and ordered that a constitutional convention propose amendments to comply with the federal Equal Protection Clause. *Jackman v. Bodine,* 43 *N.J.* 453, 458–59, 474, 478, 205 *A.*2d 713 (1964). In 1966, the Constitutional Convention proposed, and New Jersey

voters ratified, amendments providing that members of the Senate and General Assembly be elected from districts apportioned "according to the number of their inhabitants as reported in the last preceding decennial census of the United States." *N.J. Const.* art. IV, § 2, ¶ 1 (1966). The Convention and the voters simultaneously amended Paragraph 2 to require that each member of the Senate and General Assembly shall have been, for one year before his election, a citizen and resident "of the district for which he shall be elected." *N.J. Const.* art. IV, § 1, ¶ 2.

Thus, the Constitutional Convention and the voters of New Jersey changed the basis of State legislative elections from county to district to comply with the federal Equal Protection Clause. In recognition of that change, they also amended Paragraph 2 to refer to "district" rather than "county." It would be anomalous to hold that these changes, made to comply with the federal Equal Protection Clause, somehow violate that clause.

Furthermore, when the Constitutional Convention and New Jersey's voters amended Paragraph 2 to require each candidate for the Legislature to be a resident for a year in the district, they knew that the districts would be adjusted every ten years to equalize their populations. They clearly believed that it was still important for the candidates and the voters to get to know each other even if, and perhaps especially because, the legislative district boundaries would be adjusted every ten years. Those governmental objectives plainly re-endorsed and refined by the State's Constitutional Convention and voters, remain legitimate, even if those adjustments may pose practical issues every ten years.

In *Robertson,* the decennial re-apportionment did not cause problems for any of the plaintiffs.[20] Here, too, the reapportion-

---

[20] In *Robertson,* plaintiffs Dennis E. Gonzalez and Jay R. Schwartz each moved their residence in such a way that they made themselves ineligible for candidacy in their former districts, regardless of the re-apportionment. 150 *F.Supp.*2d at 694, 697–98. The plaintiff Gerald H. Zecker, an Assembly member, did not

ment did not cause the issue for respondent. Maple Shade, where she previously resided, was not in the Fourth District before or after reapportionment. Further, as the Attorney General notes, the time period for challenging the recent election has expired with no other challenges being brought, *N.J.S.A.* 19:29-3, so no issues have been or will be raised concerning the 2011 reapportionment and Paragraph 2. Therefore, reapportionment does not pose an issue in this litigation, or indeed for the remainder of this decade. *See N.J. Const.* art. IV, § 4, ¶ 3.[21]

 iv. *Robertson* cannot distinguish the longer residency requirements approved by the United States Supreme Court.

Fourth, the District Court questioned the length of the residency requirement. "It requires a considerable stretch of the imagination to find that when a person moves from one district to another it requires a year to prevent 'carpet bagging,' to enable the person to become familiar with the new district and for voters to recognize the new resident of the district." *Robertson, supra,* 150 *F.Supp.*2d at 697. As noted above, however, "the overwhelming majority" of courts have found a one-year residency requirement to be entirely justified. *Joseph, supra,* 510 *F.Supp.* at 1325–27, 1336–38. As the District Court found in *Lewis,* such familiarity "does not happen overnight"; it takes time for candidates to get to know the voters and the district, and for the many voters to learn the qualities and beliefs of the candidate. *Lewis I, supra,* 837 *F.Supp.*2d at 401–02. The *Lewis* court thought this education-

---

move his residence, and remained eligible for re-election in his district, despite the re-apportionment. *Id.* at 693 n. 2, 698.

[21] That does not mean that reapportionment might not pose an issue in ten years, after the next decennial census. As the District Court hypothesized, *Robertson, supra,* 150 *F.Supp.*2d at 698, a candidate could move to a town within his district after early November 2020, only to have the new town reapportioned into another district before the November 2021 elections. Before 2021, that issue may be addressed in legislation or regulation implementing Paragraph 2. In any case, that is an issue for another decade.

al process justified Paragraph 2's four-year state residency requirement for senators. *Ibid.* Indeed, these were the very same governmental objectives of the seven-year durational residency requirements in *Sununu* and *Chimento,* and the United States Supreme Court still found that those requirements did not violate the federal Equal Protection Clause. *See Sununu, supra,* 383 *F.Supp.* at 1290; *Chimento, supra,* 353 *F.Supp.* at 1215.

Fifth, the District Court asserted that in *Chimento* and *Sununu,* "the circumstances were so different from those that prevail in the present case, [that] the strict scrutiny inquiry leads to different results here." *Robertson, supra,* 150 *F.Supp.*2d at 698. Again, strict scrutiny is not the right standard, given the New Jersey Supreme Court's decision and reasoning in *Matthews, supra,* 84 *N.J.* 153, 417 *A.*2d 1011. Further, the District Court's attempts to distinguish *Chimento* and *Sununu* do not withstand scrutiny.

The District Court stressed that the "critical distinction" between New Jersey's residency requirement for General Assembly and New Hampshire's residency requirements upheld in *Chimento* and *Sununu* "is that the residency requirement now at issue relates not to the principal State wide offices of the State," but to "officials elected from political subdivisions of much smaller dimensions, the precise boundaries of which are subject to periodic revision." *Robertson, supra,* 150 *F.Supp.*2d at 699. The District Court's "critical distinction" cannot distinguish the United States Supreme Court's rulings, or withstand analysis, for several reasons.

The District Court's first critical distinction fails, because Paragraph 2's one-year residency requirement for the Senate and General Assembly does relate to "principal State wide offices of the State". *Cf. Robertson, supra,* 150 *F.Supp.*2d at 699. Indeed, in New Jersey there are only four state-wide elective offices: General Assembly, Senate, Lieutenant Governor, and Governor. The United States Supreme Court in *Sununu* clearly held that durational residency requirements are constitutional for state

senators. *Sununu, supra,* 420 *U.S.* 958, 95 *S.Ct.* 1346, 43 *L.Ed.*2d 435. As set forth above, members of the General Assembly and the Senate have comparable statewide powers, and are elected from the same districts. Indeed, the District Court itself rejected any distinction between the Senate and the General Assembly, because it voided the one-year district residency requirement for the Senate as well as the General Assembly. *Robertson, supra,* 150 *F.Supp.*2d at 699.

The District Court quoted *Chimento*'s language that " 'the seven year durational residency requirement applies only to the Office of Governor and State Senator, the highest elective offices in the State of New Hampshire,' " and that the rationale for residency " 'carries far greater weight than if applied to candidates for lesser public offices.' " *Id.* at 698 (quoting *Chimento, supra,* 353 *F.Supp.* at 1216). However, *Chimento* made clear that in distinguishing "lesser public offices," it was referring to cases involving local offices. *Chimento, supra,* 353 *F.Supp.* at 1216 & n. 10. Similarly, *Sununu* distinguished between local and state offices, ruling that "there is a compelling state interest in prescribing durational residence requirements for those candidates who seek state elective office." 383 *F.Supp.* at 1290, 1292. Indeed, *Sununu* noted that, "[a]lthough durational residence requirements for local offices have been held unconstitutional, no court has held unconstitutional a residency requirement for a statewide elective office." *Id.* at 1290 n. 3.

The District Court in *Robertson* asserted that the District Court in *Billington v. Hayduk,* 439 *F.Supp.* 975, 978 (S.D.N.Y.1977), *aff'd,* 565 F.2d 824 (2d Cir.1977), similarly distinguished *Chimento* and *Sununu. Robertson, supra,* 150 *F.Supp.*2d at 699. The *Robertson* Court "follow[ed] the reasoning of the [*Billington*] District Court even though" the Second Circuit affirmed on another ground and indicated that " 'we have grave doubts as to whether this matter [of the constitutionality of the five-year residency requirement] is not foreclosed by the action of the Supreme Court in summary affirmances of five- and seven-year

residency duration statutes in *Sununu, Kanapaux,* and *Chimento.'* " *Id.* at 699 & n. 3 (quoting *Billington, supra,* 565 *F.*2d at 826). The Second Circuit was correct in its doubts as to the validity of the *Billington* District Court's ruling. That District Court applied the compelling-interest-test, and mistakenly suggested that durational residency requirements could only be applied to "'the highest elective officer [sic] in the State.' " *Billington, supra,* 439 *F.Supp.* at 978–79 (quoting *Chimento, supra,* 353 *F.Supp.* at 1216). Moreover, the *Billington* District Court's principal grounds for distinguishing *Chimento* and *Sununu* were that the five-year residency requirement applied to a mere county executive, and was in a county charter rather than in the state constitution. *Id.* at 978. Neither of those distinctions apply to Paragraph 2, which is in the State Constitution and applies to a key state officer.

In any event, and most importantly, the United States Supreme Court has upheld durational residency requirements for lesser state offices. *Hadnott, supra,* 401 *U.S.* 968, 91 *S.Ct.* 1189, 28 *L.Ed.*2d 318 (state trial judge). If a state trial judge is important enough, a General Assembly member is clearly important enough. Thus, the District Court's first "crucial distinction" is untenable.

The District Court's second "crucial distinction" also fails. The United States Supreme Court has upheld durational residency requirements for "officials elected from political subdivisions of much smaller dimensions, the precise boundaries of which are subject to periodic revision," *cf. Robertson, supra,* 150 *F.Supp.*2d at 699. *Sununu* upheld seven-year state residency requirements for the twenty-four state senators in New Hampshire, even though they are officials elected from political subdivisions, of much smaller dimension than the entire state, and even though the precise boundaries of their districts are subject to periodic change after every decennial census. *Sununu, supra,* 383 *F.Supp.* at 1289 n. 1, 1292; *see N.H. Const.* Part Second, art. 26. In addition, the United States Supreme Court has held that durational residency requirements can be imposed on state trial judges, who are not only elected in, but generally assigned to, a limited geographi-

cal area. *Hadnott, supra,* 401 *U.S.* 968, 91 *S.Ct.* 1189, 28 *L.Ed.*2d
318. Indeed, *Hadnott* upheld a requirement that they have lived
in the district they are elected in, *ibid.,* just as Paragraph 2 does.

v. The District Court undervalued Paragraph 2's long and
repeated endorsement in the New Jersey Constitution.

*Robertson* 's final attempt to distinguish *Chimento* and *Sununu*
was based on a total misapprehension of Paragraph 2's constitu-
tional pedigree. The District Court noted that "the seven year
residency requirement first appeared in the New Hampshire
Constitution of 1784 and was modeled almost entirely after the
Massachusetts Constitution of 1780, which was written primarily
by John Adams." *Robertson, supra,* 150 *F.Supp.*2d at 698–99.
"Although the residency requirement at issue in the present case
appears in the New Jersey Constitution, that Constitution is of
much more recent vintage than New Hampshire's (dating from
1947) and lacks the venerable heritage of New Hampshire's char-
ter." *Id.* at 699.

In fact, New Jersey's constitution, and the challenged residency
requirement, both have a far longer constitutional pedigree than
the District Court recognized. New Jersey first adopted its
constitution on July 2, 1776, two days before the adoption of the
Declaration of Independence. Williams, *supra,* at 1. Its principal
drafter had been a delegate to the Continental Congress with
John Adams, and had obtained Adams's detailed thoughts on how
state constitutions should be structured. *Id.* at 1–2. The one-
year residency requirement was included in the 1776 Constitution.
*N.J. Const. of 1776* art. III. It was amended and included in the
1844 Constitution. *N.J. Const. of 1844* art. IV, § 1, ¶ 2. It was
incorporated into the 1947 Constitution. *N.J. Const.* art. IV, § 1,
¶ 2 (1947). Finally, it was amended and preserved in the Consti-
tution in 1966. *N.J. Const.* art. IV, § 1, ¶ 2.

Thus, New Jersey's one-year county/district residency require-
ment has a much more "venerable heritage" than the District
Court recognized. *Robertson, supra,* 150 *F.Supp.*2d at 699. In-
deed, that requirement is older than the New Hampshire constitu-

tional provisions approved in *Chimento* and *Sununu.* Further, the "merit and political wisdom" of the one-year residency requirement has thereafter been considered and readopted by the people of New Jersey three times. *See Sununu, supra,* 383 *F.Supp.* at 1291 (noting that the New Hampshire provision had been upheld once by the voters). Moreover, "the result would seem sound even if John Adams had not had a hand in drafting the disputed constitutional provision." *Chimento, supra,* 353 *F.Supp.* at 1219 (Campbell, J. concurring). To paraphrase the New Hampshire District Court, "[i]t would be presumptuous for this court to engage in judicial hypothesizing in order to hold unconstitutional a provision" of the New Jersey Constitution which has been in New Jersey's constitution since 1776, and has been considered and approved by New Jersey's voters in 1844, 1947, and 1966. *Sununu, supra,* 383 *F.Supp.* at 1291.

Even if Paragraph 2's durational residency requirement had been initially added in 1947, the New Jersey Constitution of 1947 was a very eloquent expression of the will of the people of New Jersey. For the District Court to claim that the people's will can be disregarded if a provision lacks a "venerable heritage" unfairly discounts the weight accorded to state constitutions. *See Chimento, supra,* 353 *F.Supp.* at 1217. It also discounts the power of the people now living to govern themselves, and set the qualifications for their elected representatives. New Jersey's voters, as recently as 1966, reaffirmed that candidates for General Assembly should live with the voters they seek to represent for at least one year before the election. *Robertson*'s unsuccessful attempts to distinguish *Chimento* and *Sununu,* like its other rationales, give this court no reason to void that expression of the popular will of the people of New Jersey.

This court, extending all due respect, is not persuaded by *Robertson.* As set forth above, applying the standards provided by the New Jersey Supreme Court in *Matthews, supra,* 84 *N.J.* at 169–71, 417 *A.*2d 1011, Paragraph 2 is "reasonably and suitably tailored to further legitimate governmental objectives," and the

drafters and ratifying voters of the New Jersey Constitution have "selected a reasonable time period." Accordingly, this court holds that Paragraph 2's one-year district residency requirement does not violate the federal Equal Protection Clause.

B. *The Requirement Is Constitutional As Applied To Respondent.*

 Respondent makes a fall-back argument that even if Paragraph 2's one-year district residency requirement is constitutional, it is unconstitutional as applied to her. She concedes that she has not lived in the Fourth District for one year before her election, as required by Paragraph 2. She argues that personal circumstances, particularly her work for the Mayor of Gloucester Township and her successful campaign, make it unconstitutional to apply Paragraph 2's district residency requirement to her.

To make out an as-applied challenge, respondent must show that application of Paragraph 2 to her in these circumstances deprived her of a constitutional right. *United States v. Marcavage,* 609 *F.*3d 264, 273 (3d Cir.2010); *Lewis IV, supra,* 445 *Fed.Appx.* at 601–02. Respondent must carry her "considerable burden to demonstrate that a facially neutral, non-discriminatory state constitutional mandate nonetheless has deprived [her] of a constitutional right, or unduly burdened such a right, because of [her] unique personal circumstances or characteristics." *Lewis III, supra,* 837 *F.Supp.*2d at 415–16

Respondent's personal circumstances, while admirable, do not make Paragraph 2 unconstitutional as applied to her. Her long residence elsewhere in New Jersey, her education, and her experience elsewhere in state government are to her credit, but they do not distinguish her from countless others who reside elsewhere in New Jersey, are educated, or work in state government. If those innumerable individuals could move anywhere in the State and run immediately for the General Assembly, it would nullify the district residency requirement of Paragraph 2. If Paragraph 2 could not

be constitutional as applied to this multitude, it would be facially unconstitutional. As set forth above, it is not.

In *Lewis*, the candidate, Carl Lewis, represented the United States in the 1984, 1988, 1992 and 1996 Olympic Games, won nine gold medals in track and field, and is considered by some as the greatest Olympian of all time. *Lewis III, supra,* 837 *F.Supp.*2d at 406 n. 1. He argued that "his history and ongoing connections with the State of New Jersey, his current residency, and his substantial involvement in public affairs demonstrate that, as applied to him, [Paragraph 2's] durational residency requirement is unconstitutional." *Id.* at 413. The District Court expressed admiration for "athletic, personal, and altruistic achievements." *Id.* at 416, 418. Nonetheless, the court held that Lewis's "connections to New Jersey, including his good deeds and [fame], do not place him beyond a constitutional restriction that applies to everyone who seeks to become a New Jersey State Senator." *Id.* at 418, *aff'd, Lewis IV, supra,* 445 *Fed.Appx.* 599. The same is true here.

Respondent next cites her commendable work for the Mayor of Gloucester Township, which placed her in the Fourth District and involved her with its people and issues. However, respondent only began to work there on January 4, 2010. That is a far cry from the situation in *Callaway v. Samson,* 193 *F.Supp.*2d 783 (D.N.J.2002). There, a candidate for Atlantic City Council had not resided in the ward from which he was running for the required one year before the election, as required by *N.J.S.A.* 40A:9–1.13. However, he had worked in the ward for two decades, had lived in the ward for months, had lived near the ward for decades, and had lived in Atlantic City his entire life. *Id.* at 783–85. In these "unique factual circumstances," the District Court concluded that the statute impermissibly burdened his right to intrastate travel, and was unconstitutional as applied. *Id.* at 784, 789. Here, respondent's work for less than two years in the Fourth Legislative District, and her slightly less recent arrival in the area from northern and central New Jersey, bears no comparison to *Calla-*

*way*'s two decades working in the district, and his lifetime residence in Atlantic City only blocks away.[22]

Respondent claims that her election by 19,907 votes means that Paragraph 2 cannot be applied to her. That argument, if accepted, would render Paragraph 2 almost meaningless. All election challenges under *N.J.S.A.* 19:29–3 are brought against successful candidates after either the primary or general elections. If successful campaigning, election, or vote tallies rendered it unconstitutional to apply Paragraph 2, it would render it facially unconstitutional. Again, for all the reasons set forth above, Paragraph 2 is not facially unconstitutional.

Respondent notes that she moved to the Fourth District before deciding to run for office from the Fourth District, and is not a "carpetbagger." Respondent also argues that the voters got to know her, and she got to know them, through her work and her

---

[22] Respondent also cites an unpublished Appellate Division opinion, *King v. Lopez*, No. A-2514-09T1, 2010 *WL* 4940051, 2010 *N.J.Super. Unpub. LEXIS* 2914 (N.J.App.Div. Dec. 7, 2010). Under New Jersey Court Rules, this opinion is not precedential, and is not to "be cited by any court." *R.* 1:36–3. If it is nonetheless necessary to respond to respondent's citation of *King*, this court notes that the Appellate Division affirmed "on other grounds," namely "that the action was not filed within thirty days of the election in question" as required by *N.J.S.A.* 19:29–3. *Id.* at *1, 2010 *N.J.Super. Unpub. LEXIS* 2914 at *1. In its final paragraph, the Appellate Division stated: "Nevertheless, had we considered this appeal on the merits, we would have affirmed substantially for the reasons expressed" in the December 4, 2009 opinion of the trial judge. *Id.* at *6, 2010 *N.J.Super. Unpub. LEXIS* 2914 at *18–19. It is unclear what weight this statement deserves, and this court has not been supplied with the December 4, 2009 opinion. *See R.* 1:36–3. In any event, it appears, from the Appellate Division's summary of the trial judge's ruling, that the judge found that Lopez was a resident for the required year, and indeed eight years, in the ward in which she sought election, even though she had failed to pay New Jersey taxes or obtain a New Jersey driver's license, had represented that her Florida house was her principal residence, and may have voted once in Florida by absentee ballot. *Lopez, supra,* at *2–3, 2010 *N.J.Super. Unpub. LEXIS* 2914 at *7. The judge found these actions, while possibly criminal, did not change her residence. *Ibid.; see Lewis IV, supra,* 445 *Fed.Appx.* at 602–03. Here, by contrast, it is stipulated that respondent was not a resident of the Fourth District for the required year. Nothing in *King* suggests that respondent's inadequate period of non-residency should be ignored here.

campaigning, as evidenced by their votes. By this and her other arguments, respondent asserts that she satisfies the legitimate governmental goals advanced for Paragraph 2 and similar residency requirements. However, respondent "does not undermine a [valid] state constitutional provision designed to show voter familiarity generally by ... proving that the voters are sufficiently familiar with [her]." *Lewis III, supra,* 837 *F.Supp.*2d at 415. Rather, as set forth above, she must show that applying Paragraph 2 would violate her constitutional rights. She has not done so.

Furthermore, as the District Court noted in rejecting a similar claim in Lewis III:

> If this Court were to frame the issue as Plaintiff has, trial courts faced with as-applied challenges to this and similar provisions would have to substitute their own judgment on a case-by-case basis as to whether the particular candidate's knowledge of the community and the community's familiarity with the candidate met some undefined and undefinable standard. Where would that line be drawn? Would every judge draw it in the same place?.... The effect would not be the laudable and necessary goal of equal protection but rather the opposite—the ad hoc application of an arbitrary and capricious standard by the branch of government least responsive to the public at large.
>
> [*Lewis III, supra,* 837 *F.Supp.*2d at 415 n. 15.]

This court agrees, and will not attempt to second-guess the judgment of the drafters and ratifying voters of the New Jersey Constitution, requiring a one-year residency to serve those goals, by engaging in such an ad-hoc process, which would burden the courts with endless case-by-case challenges instead of a clear rule. *See ibid.* Accordingly, Paragraph 2 is not unconstitutional as applied to respondent.

C. *Petitioner's Timely Election Challenge Is Not Barred By Laches.*

In her reply brief, respondent contended that petitioner failed to file her petition in a timely manner, and was barred by laches.

Petitioner filed her petition under *N.J.S.A.* 19:29–1(b), which provides that "[t]he nomination or election of any person to any public office" may be contested by a defeated candidate on the

ground that the successful candidate "was not eligible to the office at the time of the election." A petition contesting a nomination must be filed not later than ten days after the primary, and a petition contesting an election must be "filed not later than 30 days after the election." *N.J.S.A.* 19:29–3. Petitioner filed her petition challenging the election on December 1, 2011, within twenty-three days of the November 8, 2011, election. Therefore, her petition was timely. *See Jones v. Mitchell,* 194 *N.J.Super.* 387, 391, 476 *A.*2d 1276 (Law Div.) ("An eligibility challenge must be brought within 30 days of an election" under *N.J.S.A.* 19:29–3), *aff'd o.b.,* 194 *N.J.Super.* 337, 476 *A.*2d 1249 (App.Div.1983).

Respondent argues that petitioner's petition is untimely because she knew in June 2011 about respondent's noncompliance with Paragraph 2's one-year district residency requirement. Petitioner testified that she learned sometime in June 2011 that respondent would not have lived in Gloucester Township for a full year before the election. Petitioner told a reporter that she decided not to litigate the matter at that time because she did not have the money or resources to do so.

It is unclear whether petitioner learned of this early enough in June to file a timely petition to contest the June 7, 2011, primary by June 17, 2011. *See United States v. Scurry,* 193 *N.J.* 492, 503–04, 940 *A.*2d 1164 (2008) ("Laches may only be enforced when the delaying party had sufficient opportunity to assert the right in the proper forum"). Even if she knew in time, *N.J.S.A.* 19:29–3 did not require her to challenge the primary rather than the general election. Rather, that statute gives the challenger a choice of which vote to challenge, and sets different deadlines for each. *Ibid.*

In *Davis v. City of Plainfield,* 389 *N.J.Super.* 424, 435, 913 *A.*2d 166 (Ch.Div.2006), the facts showing that a mayoral candidacy had not been a legal voter in the city for four years, as required by the City Charter, had "been a matter of public record, and the subject of similar litigation, for over two years prior to the November 8, 2005 mayoral election." Nonetheless, the court ruled that the

plaintiffs "were required to challenge [the mayoral candidate's] eligibility for office within ten days of the June 7, 2005 primary election, namely June 17, 2005 or at the latest, within 30 days of the November 8, 2005 election, namely December 8, 2005." *Id.* at 434, 913 *A.*2d 166. It was only because the "[p]laintiffs' verified complaint was filed May 19, 2006, well outside of the thirty day time period set forth in the statute," that their complaint was out of time under *N.J.S.A.* 19:29–3. *Id.* at 434–35, 913 *A.*2d 166. Here, petitioner's petition was timely filed within that thirty-day period.

Petitioner's delay does not waiver her statutory rights. *See In re Evans,* 227 *N.J.Super.* 339, 349, 547 *A.*2d 344 (Law Div.1988). In *Evans,* the defense argued that the petitioners had known that a candidate lacked required domicile long before the general election. The Court rejected the waiver claim because *N.J.S.A.* 19:29–3 "does not advance the filing deadline by reason of early knowledge of the basis for a contest." *Id.* at 348–49, 547 *A.*2d 344. The court rejected the estoppel claim because the defendants "cannot successfully claim *reasonable* reliance on the failure of the contestants to act earlier when they knew or should have known, that *N.J.S.A.* 19:29–3 gave those contestants the right to file their petition after the general election took place." *Id.* at 349, 547 *A.*2d 344.

Indeed, it is dubious that a defense of laches can defeat the statutory right to file under *N.J.S.A.* 19:29–3, given the short time frames and important interests in that comprehensive election legislation. *See Bontempo v. Carey,* 64 *N.J.Super.* 51, 68, 165 *A.*2d 222 (Law Div.1960) (allowing election challenges because " '[a]quiescence for no length of time can legalize a clear violation of duty where the people have plainly expressed their will in the Constitution and have appointed judicial tribunals to enforce it.' " (*quoting Asbury Park Press, Inc. v. Woolley,* 33 *N.J.* 1, 14, 161 *A.*2d 705 (1960))); *see also McConnell, supra,* 467 *S.W.*2d at 320 ("Qualification of candidates being a matter in which the public

has an interest, we believe the doctrine of laches is not applicable here").

D. *Respondent's Remaining Arguments Do Not Change The Result*

In her motion to dismiss, respondent's sole argument was that "there is no one-year in-district residency requirement" because it had been declared unconstitutional by *Robertson*. In her reply, she reiterated that argument, and challenged petitioner's timeliness and remedy. Respondent's supplemental brief reiterated those arguments, except that she conceded, as she had at oral argument on December 19, 2011, that *Robertson*'s opinion, order, and injunction did not bind this court or petitioner. At the January 5, 2012, oral argument, respondent clarified that she was also raising an as-applied challenge. This court has addressed all of those arguments.

To the extent respondent is raising any other arguments, respondent has not made clear what legal or equitable theory is being raised.

 Respondent argues that the Attorney General and Secretary of State will still be bound by *Robertson*'s injunction. The Deputy Attorney General's statements at oral argument did not necessarily agree. Even if the Attorney General and Secretary of State were to remain bound by *Robertson*'s injunction, respondent concedes that such a continuing injunction does not render Paragraph 2 unconstitutional or bar petitioner's challenge to respondent's election.

Respondent argues that such a continuing injunction would complicate future elections. That may be so, but it does not make the constitutionality of Paragraph 2 a nullity. Even if the Secretary of State and Attorney General remain enjoined, future contestants and the courts concededly are not, and all future candidates would be required to comply with Paragraph 2's one-year durational residency requirement on pain of successful challenges to their nomination or election under *N.J.S.A.* 19:29-3.

As noted above, respondent's original position was that it had been declared unconstitutional by *Robertson*. Respondent similarly argues that everyone (excepting petitioner, presumably) assumed that there was no such requirement, so it would be unfair to apply it to respondent. As respondent has admitted, however, *Robertson*'s opinion and order were never binding on anyone other than the parties in that case, including the Attorney General and the Secretary of State. Paragraph 2 remained in the New Jersey Constitution, and concededly could be invoked by any contestant under *N.J.S.A.* 19:29-3, and enforced by the state courts if they were not persuaded by *Robertson*. Any candidates who ran for General Assembly without complying with Paragraph 2's constitutional requirement of one-year district residency did so at their own risk.[23] In any event, respondent has not identified to this court any legal support that these incorrect assumptions would defeat petitioner's challenge or render this constitutional requirement unenforceable in this case.

Similarly, respondent has not provided this court with any authority to support her request that Paragraph 2 should be treated as constitutional only prospectively, and applied only to future candidates, barring them but allowing her to take a seat in the General Assembly. However tempting, this court knows of no legal authority for such a result. This court has found that Paragraph 2 is, and indeed was always, constitutional. As stated above, when respondent ran for General Assembly without complying with all the constitutional requirements for that office, she was, consciously or unconsciously, taking her chances. That bet was called by petitioner, as was her right under *N.J.S.A.* 19:29-3. The only difference between respondent and future candidates is that they will have this court's opinion as well as *Robertson* to consider. That is an insufficient basis to deprive petitioner, who

---

[23] Respondent admits that she did not contact the Attorney General or Secretary of State, as other candidates reportedly have done, and did not receive any assurances that they would not apply Paragraph 2 to her. Even if she had, that would not bar a challenge by petitioner.

correctly believed Paragraph 2 was constitutional, of the remedy she is entitled to under *N.J.S.A.* 19:29–3. It is also an insufficient basis to seat in the General Assembly a candidate who failed to meet the constitutional qualifications at the time of her election.

E. *The Proper Remedies Are A New Election And An Interim Successor.*

As set forth above, Paragraph 2 is constitutional. Respondent was therefore an ineligible candidate. As petitioner's challenge to respondent's election under *N.J.S.A.* 19:29–3 is timely, this court must determine the appropriate remedy under those statutes.

The parties diverge on the appropriate remedy in this case. Petitioner's complaint originally requested that she be declared duly elected under *N.J.S.A.* 19:29–8. The Attorney General responds by stating that this court lacks the power to award the election to petitioner where there is no question that she received a smaller number of votes than respondent. *Cf. N.J.S.A.* 19:29–1(e). Petitioner has now abandoned her request.

Instead, petitioner now joins respondent in asserting that if respondent is found ineligible, a vacancy is created that must be filled under *N.J.S.A.* 19:27–11.2 by "a member of the political party of which the person who vacated the office was a candidate at the time of his election thereto," chosen by that political party's committee under *N.J.S.A.* 19:13–20. However, respondent contends that her political party gets to pick, because she ran as a Democrat, while petitioner claims that her political party gets to pick, because the retiring incumbent was a Republican. The Attorney General objects that *N.J.S.A.* 19:27–11.2 is inapplicable here because respondent never became a sitting member of the General Assembly.

The Attorney General states that respondent's certificate of election must be annulled under *N.J.S.A.* 19:29–9, creating a vacancy under *N.J.S.A.* 19:3–25. The Attorney General argues

that *N.J. Const.* art. IV, § 4, ¶ 1 provides that this vacancy can be filled only at the next general election in November 2012.

In light of these divergent arguments concerning the remedy, this court has carefully reviewed the election statutes.

> Our election laws provide us with the framework within which our Legislature has directed an election contest must proceed. In particular, the statute, *N.J.S.A.* 19:29–1 to 19:29–14, specifies both the grounds on which an election may be contested, and the manner in which the contest may be brought and decided. [*In re Contest of the November 8, 2005 General Election,* 192 *N.J.* 546, 559, 934 *A.*2d 607 (2007)].

Petitioner brings her petition under *N.J.S.A.* 19:29–1 to 19:29–14 ("Chapter 29"). Specifically, petitioner relies on *N.J.S.A.* 19:29–1(b), which permits the election to be contested on the grounds that "the incumbent was not eligible to the office at the time of the election." *N.J.S.A.* 19:29–1 provides that "[t]he term 'incumbent' means the person whom the canvassers declare elected." Thus, the statute does not use "incumbent" in its common meaning of "currently holding a given office." *Webster's II New College Dictionary* 576 (3d ed.2005). Rather, the statute uses "incumbent" to mean "the candidate whose election is challenged" by the contestant. *Iannone v. McHale,* 245 *N.J.Super.* 17, 30–31, 583 *A.*2d 770 (App.Div.1990). That is how the term "incumbent" is used throughout Chapter 29.[24] Because the canvassers have declared respondent elected, and have issued her a certificate of election, she is the "incumbent" for purposes of Chapter 29.

Chapter 29 "confers on the judge the power to set aside an election, to declare, if appropriate, which candidate was duly elected, and to order other relief." *In re Contest, supra,* 192 *N.J.*

---

[24] *See, e.g., N.J.S.A.* 19:29–2 ("[t]he petition shall be accompanied by a bond ... to the incumbent"); *N.J.S.A.* 19:29–4 ("the contestant shall cause a notice of such hearing, with a copy of the contestant's petition, to be served ... on the incumbent"); *N.J.S.A.* 19:29–8 ("The judge shall pronounce judgment whether the incumbent or any contestant was duly elected"); *N.J.S.A.* 19:29–9 ("If the judgment be against the incumbent ..."); *N.J.S.A.* 19:29–10 ("When either the contestant of the incumbent shall be in possession of the office ..."); *N.J.S.A.* 19:29–14 ("The contestant and the incumbent shall be liable ... for the costs").

at 560, 934 *A.*2d 607 (citing *N.J.S.A.* 19:29–8 to 19:29–10). Here, this court has ruled against the "incumbent," respondent. *N.J.S.A.* 19:29–9 provides: "If the judgment be against the incumbent, and he has already received a certificate of election, the judgment shall annul it. If the judge finds that no person was duly elected, the judgment shall be that the election be set aside." Accordingly, this court must annul respondent's certificate of election. *Ziegener v. Bach,* 120 *N.J.L.* 42, 44, 198 *A.* 290 (Sup.Ct. 1938).

*N.J.S.A.* 19:29–8 next requires this court to "pronounce judgment whether the incumbent or any contestant was duly elected." An eligible candidate is "duly elected" if she receives "the greatest number of votes." *See N.J.S.A.* 19:21–1. However, respondent was not duly elected because she "was not eligible to the office at the time of [her] election." *N.J.S.A.* 19:29–1(b).

In some circumstances, a ruling that the incumbent is not duly elected can mean that "the candidate receiving the next highest number of votes is entitled to a certificate of election." *Ziegener, supra,* 120 *N.J.L.* at 44, 198 *A.* 290. However, in other circumstances, such a ruling does not mean that the second-place candidate is duly elected. *N.J.S.A.* 19:29–9 specifically provides that "[i]f the judge finds that no person was duly elected, the judgment shall be that the election be set aside." Thus, in *Ziegener,* the Supreme Court rejected the second-place candidate's request for a certificate of election because the trial court "*set aside*" the election due to fraud. 120 *N.J.L.* at 43–44, 198 *A.* 290. "[T]he judge entering such an order must necessarily have found that 'no person was duly elected.' And, if no person was duly elected, it follows that none is entitled to a certificate of election." *Id.* at 44, 198 *A.* 290 (citing *N.J.S.A.* 19:29–9).

The Supreme Court has held that "[o]nly when [election] irregularities 'are such that the court cannot with reasonable certainty determine who received the majority of the legal vote,' can a court set aside an election." *In re Gray–Sadler,* 164 *N.J.* 468, 482, 753 *A.*2d 1101 (2000) (citations omitted). However, "where the result

of the [irregularity] can be ascertained and its effect exscinded, and the true will of the electorate determined, this should be done." *Burkett v. Francesconi*, 127 *N.J.L.* 541, 544, 23 *A.*2d 780 (Sup.Ct.1942); *Application of Bonsanto*, 171 *N.J.Super.* 356, 361, 409 *A.*2d 290 (App.Div.1979).

For example, when the irregularity is that "legal votes rejected at the polls [were] sufficient to change the result," *N.J.S.A.* 19:29–1(e), because the court cannot "determine with reasonable certainty those candidates who would have received a majority of votes" if those votes had been counted, the election must be declared "null and void." *Gray–Sadler, supra,* 164 *N.J.* at 482–84, 753 *A.*2d 1101. By contrast, when the irregularity is that "illegal votes have been received," *N.J.S.A.* 19:29–1(e), if those illegal votes can be excluded and the results of the legal votes determined, the winner can be declared duly elected under *N.J.S.A.* 19:29–8 and receive a certificate of election. *See e.g., Gramlich v. Cottrell,* 204 *N.J.Super.* 490, 495, 499 *A.*2d 275 (Law Div.1985); *see also Burkett, supra,* 127 *N.J.L.* at 546–47, 23 *A.*2d 780 (excluding votes from districts tainted by fraud and declaring duly elected the candidate receiving the majority of the legal votes).

Here, the 19,907 voters who cast their ballots for respondent did not cast their votes improperly or illegally; rather, unbeknownst to them, the candidate they voted for was ineligible for the office of General Assembly. If due to respondent's ineligibility she had been removed (or replaced) on the ballot, several candidates could have received some or all of those votes. Respondent's votes, shifted to any of the unsuccessful (or replacement) candidates, would have been sufficient to put any one of them among the top two vote-getters, and thus in the General Assembly. This court does not know which of those candidates would have ended up in the top two. Thus, this court cannot "determine with reasonable certainty those candidates who [would have] received a majority of votes" if those votes had been counted for an eligible candidate. *Gray–Sadler, supra,* 164 *N.J.* at 484, 753 *A.*2d 1101. Accordingly, this court cannot find that petitioner, or indeed any of the unsuc-

cessful candidates, was duly elected. Because none of the unsuccessful candidates were duly elected, this court's judgment must be that the election shall be set aside. *N.J.S.A.* 19:29–9.

To rule otherwise would treat these 19,907 votes as a nullity. *See In re Contest, supra,* 192 *N.J.* at 559, 934 *A.*2d 607 (election laws should be construed so that "voters are permitted to exercise the franchise"). That would be contrary to the "the heart of the inquiry," which "is the need to safeguard the franchise of not only the voters who cast valid votes at the election, but also those whose votes were rejected." *Gray–Sadler, supra,* 164 *N.J.* at 482, 753 *A.*2d 1101. Whether those votes are regarded as valid, rejected, or wasted, the voters who cast them should not be deprived of the opportunity to cast those votes in a meaningful way.

As a result of setting aside the election, the Fourth Legislative District will have no new member of the General Assembly to replace the retiring Assembly member when his term expires on January 10, 2012. All parties agree that a vacancy will occur on that date. Indeed, *N.J.S.A.* 19:3–25 provides that "[w]hen a person shall remove or be removed from office because his nomination or election thereto has been declared null and void, such office shall be deemed to be vacant." [25]

--------

[25] Petitioner argues that *N.J.S.A.* 19:3–25 does not apply because it refers to removal from office, and there is dicta to that effect. *Application of Moffat,* 142 *N.J.Super.* 217, 227 n. 3, 361 *A.*2d 74 (App.Div.1976) ("[i]t would appear that this section is not applicable" where an elected candidate "had not yet assumed office"). Whatever its facial appeal, petitioner's argument is unpersuasive. *N.J.S.A.* 19:3–25 was part of the same legislation that enacted *N.J.S.A.* 19:29–9, which is the obvious and apparently only statutory means by which a "nomination or election" can be "declared null and void," *N.J.S.A.* 19:3–25. That declaration normally occurs before the candidate assumes office, and perhaps must do so. *See N.J. Const.* art. IV, § 4, ¶ 2 ("Each house shall be the judge of the elections ... of its own members"). Reading *N.J.S.A.* 19:3–25 as inapplicable in that situation would leave *N.J.S.A.* 19:29–9 without a statutory declaration of vacancy that triggers the vacancy-filling statutes. *N.J.S.A.* 19:3–25 should not be read to negate its most obvious purpose, short-circuit the statutory scheme, and create unfillable seats in the Legislature. As *Moffat* ruled in interpreting

While vacancies for some municipal offices can be filled by special election held separately from a general election, *see, e.g., Gray–Sadler, supra,* 164 *N.J.* at 484, 753 *A.*2d 1101 (citing *N.J.S.A.* 40A:16–16), that is not true for vacancies in the General Assembly. *See Assembly Concurrent Resolution No. 40* (1988) (reprinted after *N.J. Const.* art. IV, § 4, ¶ 1). The New Jersey Constitution provides in Article IV, Section 4, Paragraph 1 ("Vacancy Paragraph") that "[a]ny vacancy in the Legislature occasioned otherwise than by expiration of term shall be filled by election for the unexpired term only at the next general election occurring not less than 51 days after the occurrence of the vacancy...." *N.J. Const.* art. IV, § 4, ¶ 1; accord *N.J.S.A.* 19:27–11.1; *see e.g., Catania v. Haberle,* 123 *N.J.* 438, 440, 588 *A.*2d 374 (1990) (special election held under *N.J.S.A.* 19:27–11.1). The next general election is on November 6, 2012. At that time, an election will held in the Fourth District and the vacancy will be filled by a successor elected for the unexpired term.

■ The primary dispute is regarding whether the vacant seat can be filled during the interim period between the expiration of the retiring Assembly member's term and the swearing in of the successor elected on November 6, 2012. As noted above, petitioner and respondent seek to invoke *N.J.S.A.* 19:27–11.2, which provides:

> In the case of a vacancy occurring with respect to a member of the Senate or General Assembly who was elected as the candidate of a political party which at the last preceding general election held for all members of the General Assembly received the largest number of votes or the next largest number of votes in the State for members of the General Assembly, for the interim period pending the election and qualification of a permanent successor to fill the vacancy, ... the vacancy shall be filled within 35 days by a member of the political party of which

---

another vacancy statute, "the statute should not be construed so narrowly" as to be applicable solely to "a vacancy occurring *during* a term of office," because that "would frustrate the clear Legislative design to exclude only those cases where the vacancy, by reason of the expiration of the term of office, would be filled by the electorate in the normal course of events." 142 *N.J.Super.* at 229–30, 361 *A.*2d 74.

the person who vacated the office was the candidate at the time of his election thereto.

*See, e.g., Catania, supra,* 123 *N.J.* at 440, 588 *A.*2d 374 (where sitting Senator died during his term, his party was empowered to fill the vacancy under *N.J.S.A.* 19:27–11.2).

The Attorney General asserts that petitioner and respondent cannot invoke *N.J.S.A.* 19:27–11.2, because she believes that it applies only in the case of a vacancy occurring with respect to a sitting member of the Senate or General Assembly. The Attorney General argues that, because respondent's election was null and void before she was sworn in, she never became a member of the General Assembly. The Attorney General therefore concludes that the Fourth Legislative District seat must remain vacant until the successor elected on November 6, 2012, is sworn in during January 2013.

This conclusion, because it leaves the Fourth Legislative District seat vacant for more than a year, is not to be desired. Happily, it is not required. Consideration of the history and interrelation of all the cited provisions indicates that the vacancy can be filled by an interim successor during this period.

Prior to 1988, the Vacancy Paragraph of the New Jersey Constitution provided:

Any vacancy in the Legislature occasioned by death, resignation or otherwise shall be filled by election for the unexpired term only, as may be provided by law. Each house shall direct a writ of election to fill any vacancy in its membership; but if the vacancy shall occur during a recess of the Legislatures, the writ may be issued by the Governor, as may be provided by law.

[*N.J. Const.* art. IV, § 4, ¶ 1 (1947).]

On November 8, 1988, New Jersey's voters approved an amendment, proposed by Concurrent Resolution No. 40 of 1988, to add the current Vacancy Paragraph:

Any vacancy in the Legislature occasioned otherwise than by expiration of term shall be filled by election for the unexpired term only at the next general election occurring not less than 51 days after the occurrence of the vacancy, except that no vacancy shall be filled at the general election which immediately precedes the expiration of the term in which the vacancy occurs. For the interim period pending the election and qualification of a successor to fill the vacancy, or for the remainder of the term in the case of a vacancy occurring which cannot be filled

pursuant to the terms of this paragraph at a general election, the vacancy shall be filled within 35 days by the members of the county committee of the political party of which the incumbent was the nominee from the municipalities or districts or units thereof which comprise the legislative district.

[*N.J. Const.* art. IV, § 4, ¶ 1.]

Concurrently, the Legislature passed a statute (*L.* 1988, *c.* 126) which was to become operative on the same day as the new Vacancy Paragraph. Section 7 of that statute added *N.J.S.A.* 19:27–11.1, and Section 8 of that statute added *N.J.S.A.* 19:27–11.2. *N.J.S.A.* 19:27–11.1 copies almost verbatim the first sentence of the Vacancy Paragraph, and then adds implementing language. *N.J.S.A.* 19:27–11.2 copies almost verbatim the second sentence of the Vacancy Paragraph, and similarly adds implementing language.

Thus, *N.J.S.A.* 19:27–11.1 and *N.J.S.A.* 19:27–11.2 should be read as implementing the constitution's Vacancy Paragraph. The Vacancy Paragraph covers "[a]ny vacancy in the Legislature occasioned otherwise than by expiration of term." *N.J. Const.* art. IV, § 4, ¶ 1. *N.J.S.A.* 19:27–11.1 similarly covers "any vacancy happening in the Legislature otherwise than by expiration of term," adding only the word "happening." In the event of such a vacancy, the first sentence of the Vacancy Paragraph, and *N.J.S.A.* 19:27–11.1, both provide for an election to pick a successor at the next general election. The second sentence of the Vacancy Paragraph plainly contemplates, in the event of such a vacancy, that an interim successor, to serve during the period before that successor can take office, will be chosen by the county committee of the appropriate political party. *N.J. Const.*, art. IV, § 4, ¶ 1; *see Assembly Concurrent Resolution No. 40* (1988). *N.J.S.A.* 19:27–11.2 similarly provides that, in the event of a vacancy, an interim successor, to serve during the period before that successor can take office, will be chosen by the county committee of the appropriate political party.

Because the Legislature broke up the content of the Vacancy Paragraph into two statutory sections, it had to insert prefatory language into *N.J.S.A.* 19:27–11.2 to explain that it, like *N.J.S.A.*

19:27–11.1 and the Vacancy Paragraph, was triggered by "[a]ny vacancy in the Legislature occasioned otherwise than by expiration of term." *N.J. Const.* art. IV, § 4, ¶ 1; *N.J.S.A.* 19:27–11.1. There is no reason to believe that the inserted prefatory language was meant to limit or change that triggering event, anymore than the Legislature meant to change the triggering event by inserting the word "happening" in *N.J.S.A.* 19:27–11.1. The Legislature's inserted prefatory description of the triggering event, "a vacancy occurring with respect to a member of the Senate or General Assembly," should be treated as synonymous with the triggering event in the Vacancy Paragraph and *N.J.S.A.* 19:27–11.1.

This interpretation of *N.J.S.A.* 19:27–11.2 fits the history of these provisions. It ensures that the Vacancy Paragraph is fully implemented by legislation. Most importantly, it ensures that in the event of "[a]ny vacancy in the Legislature occasioned otherwise than by expiration of term," an interim successor is appointed to represent a legislative district which might otherwise go without representation and a voice in the State Legislature for a year or more. Again, to interpret it otherwise "would frustrate the clear Legislative design to exclude only those cases where the vacancy, by reason of the expiration of the term of office, would be filled by the electorate in the normal course of events." *Application of Moffat, supra,* 142 *N.J.Super.* at 229–30, 361 *A.2d* 74.[26]

Accordingly, this court accepts this supported and salutary interpretation of *N.J.S.A.* 19:27–11.2, rather than the Attorney General's position that the Fourth Legislative District's seat in the General Assembly must remain vacant until the next general election. As the Attorney General argues, respondent's ineligibility for office, and therefore the nullification of her election, has

---

[26] Petitioner argues that this vacancy is occasioned by the expiration of the former Assembly member's term. His decision not to run again in the Fourth Legislative District did not create this vacancy; rather, it was created by respondent's ineligibility, as revealed by petitioner's election challenge, because it prevented the seat from being filled by the electorate in the normal course of events.

occasioned a vacancy in the Legislature under *N.J.S.A.* 19:3–25. Under the Vacancy Paragraph and *N.J.S.A.* 19:27–11.2, for the interim period pending the swearing in of a successor elected in the next general election, an interim successor must be appointed by the county committee of the appropriate political party.

As described above, petitioner and respondent differ on which of their political parties gets to make the appointment of the interim successor. The Vacancy Paragraph states that the vacancy shall be filled by a person chosen by "the county committee of the political party of which the incumbent was the nominee." *N.J. Const.* art. IV, § 4, ¶ 1. *N.J.S.A.* 19:27–11.2 states that the vacancy shall be filled by "a member of the political party of which the person who vacated the office was the candidate at the time of his election thereto," chosen by "the appropriate political party's county committee." Assembly Concurrent Resolution No. 40 of 1988, which proposed the Vacancy Paragraph, states that the vacancy "will be filled through appointment by those members of the county committee of the vacating incumbent's political party."

As noted above, the word "incumbent" has both a common and a technical meaning. The key word here, however, is vacate. When the Legislature explained the constitutional amendment it was proposing, it referred to the "vacating incumbent." *Assembly Concurrent Resolution No. 40* (1988). Although the Vacancy Paragraph referred solely to "incumbent," the implementing legislation reiterated that the provision referred to "the person who vacated the office [who] was the candidate at the time of his election." *N.J.S.A.* 19:27–11.2. This explanation in the implementing statute makes clear that these provisions are all referring to the person who caused the office to be vacant. As set forth above, the vacancy here was caused by the election of Respondent, so Respondent is the "the person who vacated the office." *N.J.S.A.* 19:27–11.2. The Democratic Party was the party of which Respondent "was the candidate at the time of [her] election" to the office she has made vacant. *N.J.S.A.* 19:27–11.2. Therefore, "[t]he interim successor shall be selected by the [Democratic] party's county

committee ... in the same manner prescribed in subsections (a) and (b) of R.S. 19:13–20." *N.J.S.A.* 19:27–11.2.

This reference to *N.J.S.A.* 19:13–20 further supports the interpretation that the vacancy is to be filled by the party whose candidate has been forced to vacate the office. *N.J.S.A.* 19:13–20 was amended by the same statute (*L.* 1988, *c.* 126) that added *N.J.S.A.* 19:27–11.1 and –11.2, and similarly implements the Vacancy Paragraph. *N.J. Const.* art. IV, § 4, ¶ 1 (requiring that the appointment be made by the members of the county committee from the legislative district); *N.J.S.A.* 19:13–20(a)(3), (4) (same). *N.J.S.A.* 19:13–20(a)(1)–(4) provides that the candidate shall be selected from the political "party wherein the vacancy has occurred."

This interpretation also serves the goal of implementing the will of the voters as much as possible. *See In re Contest, supra,* 192 *N.J.* at 559, 934 *A.2d* 607 (election laws should be construed so "the will of the people as expressed through an election is heard"). A vote for a candidate often reflects a vote for a party. Where that candidate must vacate that office, e.g., due to death, it reflects the will of the voters if the interim successor comes from the same party. While that seems less deserved when the vacancy is caused by the party's choice of an ineligible candidate, it still is a better reflection of the will of the voters than to have the choice made by the party which the voters did not favor.

▪ In considering the appropriate remedy, this court has kept foremost in mind the Supreme Court's admonitions in *N.J. Democratic Party, Inc. v. Samson,* 175 *N.J.* 178, 190, 814 *A.2d* 1028 (2002):

> The general rule applied to the interpretation of our election laws is that absent some public interest sufficiently strong to permit the conclusion that the Legislature intended strict enforcement, statutes providing requirements for a candidate's name to appear on the ballot will not be construed so as to deprive the voters of the opportunity to make a choice.
>
> . . .
>
> ▪ When this Court has before it a case concerning the New Jersey election laws, we are directed by principle and precedent to construe those laws so

as to preserve the paramount right of the voters to exercise the franchise. We have understood our Legislature, in establishing the mechanisms by which elections are conducted in this State, to intend that the law will be interpreted "to allow the greatest scope for public participation in the electoral process, to allow candidates to get on the ballot, to allow parties to put their candidates on the ballot, and most importantly to allow the voters a choice on Election Day." [ (citations omitted) ].

In this case, this court has before it a constitutional requirement, under which respondent is constitutionally ineligible for the high office of General Assembly. The public interest in that requirement is so strong that Paragraph 2's requirement has been enshrined in the New Jersey Constitution for over 235 years, and has been repeatedly ratified by New Jersey's voters. In enforcing that constitutional requirement, this court has attempted to find a remedy that does not deprive the voters of the opportunity to make a choice by providing for an election at the earliest possible date, at which time the voters can choose among constitutionally eligible candidates. At the same time, this court has preserved the right of the voters to representation under the provisions authorizing the appointment of an interim successor.[27]

This court is cognizant that respondent's ineligibility has not only cost her the recent election, but may lead to her not being selected as the interim or elected successor despite her experience and interest in the Fourth Legislative District. This court is also aware that a special election, even when conducted with a general election, entails effort and expense. This court also appreciates the uncertainty and disruption that may result.

This court's obligation, however, is to apply the United States Constitution, the New Jersey Constitution, and New Jersey's election laws. The New Jersey Constitution set a qualification for

27 This case, unlike *Samson, supra,* 175 *N.J.* at 194, 814 *A.*2d 1028, is not a situation where "there is sufficient time to place a new candidate on the ballot and conduct the election in an orderly manner." The election has been held, and a constitutionally ineligible candidate has been elected. Accordingly, this court has followed the procedures in the New Jersey Constitution and in the statutes designed to address just this situation.

election that respondent did not meet. The United States Constitution does not invalidate that qualification. New Jersey's election laws require that respondent's certificate of election be annulled, that the election be set aside, and that a new election be held in November 2012. These provisions are all designed to ensure that the voters can exercise their votes in a knowledgeable and meaningful way to elect qualified candidates. By enforcing these provisions, those laudable goals will be better served in the future.